Lawrence D. CALDWELL,
Plaintiff-Appellant,

v.

Harold G. MILLER, Warden,
Defendant-Appellee.

No. 84–2522.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 7, 1986.

Decided May 8, 1986.

As Amended June 3, 1986.

Rehearing Denied June 16, 1986.

Randall F. Kender, Jenner & Block, Chicago, Ill., for plaintiff-appellant.

Richard H. Lloyd, Asst. U.S. Atty., Frederick J. Hess, U.S. Atty., East St. Louis, Ill., for defendant-appellee.

Before WOOD and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

The plaintiff, an inmate incarcerated at the United States Penitentiary at Marion, Illinois, brought this suit in federal district court challenging restrictions imposed by, and conditions of confinement resulting from, a "lockdown" of that facility instituted on October 28, 1983. The primary questions presented in this appeal are whether the lockdown restrictions impermissibly burden his right to free exercise of religion, resulted in conditions of confinement that constitute cruel and unusual punish-

ment, violate his right of access to the courts, whether the prolonged imposition of the lockdown without an opportunity for him to challenge it violated his right to due process of law, and whether his personal legal and religious books were confiscated without due process. The district court granted the respondent prison official's motion for summary judgment as to all claims. For the reasons stated below, we will affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I

The plaintiff, Lawrence D. Caldwell, is an inmate at the United States Penitentiary at Marion, Illinois ("Marion"). In late October of 1983, inmate violence at Marion resulted in the death of one prisoner and two guards. Caldwell was not involved in these incidents. On October 28, 1983, Harold G. Miller,[1] then the warden at Marion, declared a state of emergency and "locked down" the institution, essentially suspending all inmate activities. Those restrictions included the limitation of exercise privileges, the suspension of contact visitation,[2] the confinement of inmates in their cells for twenty-four hours a day, a total ban on group religious services, and a prohibition against direct access to the main law library at Marion. On October 31, 1983, a

Bureau of Prisons ("Bureau") task force began an evaluation of security and operational procedures at Marion. It recommended that Marion continue as a level-six institution,[3] and that physical-plant and operational changes be made, although it is not clear from the record exactly what those recommendations were.[4]

Shortly after the lockdown restrictions were imposed, prison officials at Marion confiscated all hardbound books in the possession of inmates, including Caldwell's personal legal and religious volumes. Caldwell was told he could either have his books sent home, have them donated to an agency outside Marion, or have them destroyed. Having no family and not wishing his books be destroyed, Caldwell donated them to organizations outside Marion. Approximately two months later, Miller again allowed inmates to have hardbound books in their cells.

On March 13, 1984, Caldwell, acting *pro se*,[5] filed a complaint challenging the lockdown restrictions on a number of constitutional grounds. In particular he alleged (1) that the complete ban on congregational religious services violates his right to free exercise under the First Amendment, (2) that the restrictions on exercise and the ban on contact visitation constitute cruel and unusual punishment under the Eighth

---

**1.** Caldwell brought this suit against H.S. Miller in his official capacity as warden at Marion. We note that Jerry Williford is now warden. Pursuant to Fed.R.App.P. 43(c) "[w]hen a public official is a party to an appeal or other proceeding in the court of appeals in his official capacity and during its pendency ... ceases to hold office, the action does not abate and his successor is automatically substituted as a party."

**2.** According to Bureau of Prison regulations, "contact visitation" describes the practice of allowing limited physical contact between an inmate and visitors, such as handshaking, embracing and kissing. 28 C.F.R. § 540.51(g)(2) (1985).

**3.** In February of 1979, Marion was designated by the Bureau as the only level-six institution in the federal corrections system, the highest maximum security classification. As such, Marion is the penitentiary to which inmates who have a demonstrated tendency to violence or to escape are committed. *See Garza v. Miller,* 688 F.2d

480, 482 (7th Cir.1982), *cert. denied,* 459 U.S. 1150, 103 S.Ct. 796, 74 L.Ed.2d 1000 (1983); *Bono v. Saxbe,* 620 F.2d 609, 611 (7th Cir.1980).

**4.** Apparently, some of the restrictions Caldwell challenges are to be in effect only until changes in the physical plant are completed, and until modified operating procedures are implemented. At oral argument, counsel for Caldwell and Miller both indicated that various restrictions had been relaxed to some extent since appeal was taken, and that these or other restrictions will have or may have been lessened to some further degree at the time this opinion is released.

**5.** The law firm of Jenner & Block was appointed to represent Caldwell on appeal, and we are grateful to the firm, and in particular to Jerold S. Solovy, Susan Spangler, and Randall F. Kender, for their able and distinguished representation.

Amendment, (3) that the prolonged imposition of the lockdown without a hearing or opportunity for him to challenge it before prison officials violated his right to due process under the Fifth Amendment, (4) that the confiscation of his legal and religious books likewise denied him due process, and (5) that the law library use restrictions impermissibly burden his right of access to the courts.

■ By consent of the parties, the case was submitted to a magistrate pursuant to 28 U.S.C. § 636(c).[6] Following oral argument on Miller's motion,[7] the district court granted summary judgment against Caldwell on all except the library access and free-exercise claims. As to these latter claims, the court granted Caldwell leave to submit affidavits on the nature of religious services then available at Marion, and granted Miller leave to submit affidavits on the issue of whether Caldwell had access to

District of Columbia caselaw.[8] After submission of affidavits on these matters, the court granted summary judgment in favor of Miller on the remaining claims. Caldwell appeals from the grant of summary judgment as to all claims.

## II

■ Before turning to the substantive issues raised by Caldwell on appeal, we must address a procedural matter. Caldwell filed his complaint under the federal mandamus acts, 28 U.S.C. §§ 1361 and 1651. The district court construed Caldwell's complaint as one seeking either a writ of habeas corpus or a writ of mandamus under these statutes. The court held that neither the mandamus statutes nor the habeas statute provided a statutory basis for federal jurisdiction over Caldwell's complaint.[9] The district court, however, after

6. For the first time on appeal, counsel for Caldwell argues that his consent to trial by a magistrate was not a "truly voluntary and informed" waiver of his constitutional right to a trial before a United States District Judge. We express no opinion on the merits of this claim, because of the paucity of the record before us. Caldwell is not, however, precluded from pursuing this claim on remand. We point out, nonetheless, that district courts should take steps to inform prisoners proceeding *pro se* of their right under Article III to have proceedings in their causes conducted before a district judge as opposed to a magistrate, and to ensure that the unfamiliarity of such a claimant with the judicial system does not work to deny him the exercise of that right.

7. Caldwell contends that the district court followed improper procedure in granting summary judgment by holding an evidentiary hearing in order to determine whether genuine issues of material fact existed as to his claims. In our opinion this inaccurately characterizes the proceedings below. It is true that the first hearing was designated a "bench trial" by the court reporter, but only the Assistant U.S. Attorney and Caldwell were present, and no witnesses were sworn or testimony taken. Rather, the magistrate asked Caldwell to outline his claims so as to "[get] an idea on the motion." The transcript comprised only twenty-eight pages. The second proceeding was designated an "evidentiary hearing." Once again, no witnesses were sworn or testimony taken. Referring to the first proceeding, the magistrate stated to Caldwell that "we previously heard arguments in this case," and informed him that an affidavit

of Reverend West, one of the chaplains at Marion, had been submitted to the court. He then said to Caldwell: "I think that we have covered everything on the motion. We covered everything at the last motion hearing, didn't we?" The magistrate then took the motion for summary judgment under advisement. The entire second proceeding comprised four pages of transcript.

Caldwell was proceeding *pro se* and his complaint contained at best conclusory factual allegations. Moreover, Caldwell had submitted neither affidavits nor a brief in opposition to Miller's motion for summary judgment. The magistrate was giving Caldwell the opportunity to indicate what sort of evidence he would rely on should the cause go to trial. Such a procedure is entirely consonant with the practice of not holding *pro se* litigants to the more stringent standards applied to formally trained attorneys. See, e.g., Hughes v. Rowe, 449 U.S. 5, 9–10, 101 S.Ct. 173, 175–76, 66 L.Ed.2d 163 (1980) (per curiam); Haines v. Kerner, 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972). To fault the manner in which the district court conducted the proceedings here would unduly inhibit a salutary practice. Thus, we will consider the proceedings below as oral argument on Miller's motion for summary judgment.

8. Caldwell was originally convicted in the District of Columbia. He, therefore, needs access to District of Columbia caselaw.

9. We express no opinion concerning the reasons given by the district court for holding that it had no jurisdiction over Caldwell's complaint pursu-

concluding that it had no jurisdiction, decided the merits of Caldwell's claims by granting summary judgment for Miller. On appeal, Caldwell argues that the district court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

It is well settled that *pro se* litigants are not held to the stringent standards applied to formally trained members of the legal profession, and that, accordingly, we construe *pro se* complaints liberally. *See, e.g., Hughes v. Rowe*, 449 U.S. 5, 9–10, 101 S.Ct. 173, 175–76, 66 L.Ed.2d 163 (1980) (per curiam); *Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972); *Bates v. Jean*, 745 F.2d 1146, 1150 (7th Cir.1984); *Childs v. Duckworth*, 705 F.2d 915, 922 (7th Cir.1983). It is also well settled that Fed.R.Civ.P. 8(a)(1) does not require a plaintiff to set forth the statutory basis for the district court's subject-matter jurisdiction in order for the court to assume jurisdiction, so long as he alleges facts sufficient to bring the case within the court's jurisdiction. *Jensen v. State Board of Tax Commissioners*, 763 F.2d 272, 278 (7th Cir.1985); *Rohler v. TRW, Inc.*, 576 F.2d 1260, 1264 (7th Cir.1978); *see also Loss v. Blankenship*, 673 F.2d 942, 950 (7th Cir.1982) ("Imperfections in pleading style will not divest a federal court of jurisdiction where the complaint as a whole reveals a proper basis for jurisdiction.").

It is clear from the face of Caldwell's complaint that he has alleged a number of constitutional violations, arising out of the lockdown at Marion, sufficient to give the district court jurisdiction under 28 U.S.C. § 1331. *See Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946); *Garza v. Miller*, 688 F.2d 480, 482 (7th Cir.1982), *cert. denied*, 459 U.S. 1150, 103 S.Ct. 796, 74 L.Ed.2d 1000 (1983). Hence, we shall review the disposition of Caldwell's complaint below, not as a dismissal for want of jurisdiction, but as an adjudication of the merits.

ant to either 28 U.S.C. § 2254 or the mandamus provisions.

## A. BAN ON GROUP RELIGIOUS SERVICES.

Caldwell claims that the ban on group religious services at Marion unconstitutionally infringes upon his ability to worship. Caldwell is a Roman Catholic. Neither he nor any other inmate at Marion may participate in Mass, or other group religious functions. Rather, all religious services and instruction are conducted on an individual basis by Marion's two chaplains. The chaplains may not enter an inmate's cell. Instead, they "walk" each cell unit at least once weekly, and attend to the religious needs of inmates so desiring. The chaplains are available for emergencies, and private conferences may be scheduled. The district court found the ban on group religious services to be reasonable in light of the security needs at Marion, and granted summary judgment in favor of Miller.

Caldwell argues that the district court's grant of summary judgment was improper for three reasons: (1) the evidence of security needs at Marion offered in support of the ban was insufficient; (2) the court did not consider whether conditions at Marion warranted continuing the ban at the time summary judgment was entered, approximately nine months after the lockdown;[10] and (3) the court did not require that Miller adopt the least restrictive alternative in meeting the security concerns that might be implicated by congregational services. We agree with Caldwell that the district court did not consider, nor was there evidence before it, whether a total ban on group religious activities was supported by conditions existing at the time summary judgment was granted. We do not agree, however, that the district court erred by declining to consider whether a total ban was the least restrictive measure Miller could have adopted.

 Lawful incarceration necessarily brings with it the restriction of many privileges and rights. *Hudson v. Palmer*, 468 U.S. 517, ——, 104 S.Ct. 3194, 3199, 82

**10.** Almost two-and-one-half years have now passed since the October 28, 1983, lockdown.

L.Ed.2d 393 (1984); *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979); *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). The right to the free exercise of religious beliefs, nevertheless, does not abate upon imprisonment. *Hudson*, 468 U.S. at ——, 104 S.Ct. at 3198; *Cruz v. Beto*, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972) (per curiam); *Childs*, 705 F.2d at 920; *Madyun v. Franzen*, 704 F.2d 954, 960 (7th Cir.), *cert. denied*, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983). That right may, of course, be restricted in order to achieve legitimate correctional goals, and to maintain institutional security. *Bell v. Wolfish*, 441 U.S. at 546–47, 99 S.Ct. at 1877–78; *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974); *Pell*, 417 U.S. at 822–23, 94 S.Ct. at 2804; *Childs*, 705 F.2d at 920; *Arsberry v. Sielaff*, 586 F.2d 37, 44 (7th Cir.1978). We must, however, carefully scrutinize prison restrictions that affect an inmate's free-exercise rights "to ascertain the extent to which they are necessary to effectuate the legitimate policies and goals of the corrections system." *Childs*, 705 F.2d at 920. Prison rules that restrain the free exercise of religion are justified only if they are "reasonably adapted" to achieving an important penological objective.[11] *Madyun*, 704 F.2d at 960; *see also La Reau v. MacDougall*, 473 F.2d 974, 979 (2nd Cir. 1972), *cert. denied*, 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973).

■ We accord, as we must, prison officials wide-ranging deference in adopting policies that are needed to preserve internal order and security, *Hewitt v. Helms*, 459 U.S. 460, 474, 103 S.Ct. 864, 872–73, 74 L.Ed.2d 675 (1983); *Bell v. Wolfish*, 441 U.S. at 547–48, 99 S.Ct. at 1878; *Pell*, 417 U.S. at 827, 94 S.Ct. at 2806, and we will not substitute our judgment for theirs "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations." *Pell*, 417 U.S. at 827, 94 S.Ct. at 2806; *see Block v. Rutherford*, 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984); *Hewitt*, 459 U.S. at 467, 470, 103 S.Ct. at 869–70; *Bell v. Wolfish*, 441 U.S. at 547–48, 554–55, 562–63, 99 S.Ct. at 1878–79, 1882–83, 1886–87. This does not mean, however, that it is appropriate for us to defer completely to prison administrators. *Madyun*, 704 F.2d at 959. By requiring that a prison regulation or policy be reasonably adapted to an important correctional goal, we protect the legitimate interest of

**11.** Caldwell argues that the district court should have applied a "least restrictive alternative" standard in deciding his free-exercise claim. He contends that we adopted such a standard in *Cooper v. Pate*, 382 F.2d 518 (7th Cir.1967). In *Cooper*, Elijah Muhammad Muslims at the Illinois State Penitentiary were completely denied group religious services, while other religious denominations were permitted to hold services. We affirmed the district court's injunction against this discriminatory practice. The district court found that there were "less drastic and less sweeping means of achieving necessary control of such group services than categorically banning them." *Id.* at 522. We noted that this finding was "in part a recognition that discrimination in treatment of adherents of different faiths could be justified, if at all, only by the clearest and most palpable proof that the discriminatory practice is a necessity." *Id.*

It is far from clear what force *Cooper* should be given in a case not involving the discriminatory treatment of members of a particular faith. We also decided *Cooper* without the benefit of much of the Supreme Court jurisprudence in the area of inmate rights, most notably *Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2827, 41 L.Ed.2d 495 (1974); *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In *Cruz*, for example, the Supreme Court held that an inmate may not be "denied a *reasonable opportunity* of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Cruz*, 405 U.S. at 331, 92 S.Ct. at 1081 (emphasis added). Thus, we do not read *Cooper* as requiring that we append a "least restrictive alternative" qualifier to the standard set forth in *Madyun v. Franzen*, 704 F.2d 954 (7th Cir.), *cert. denied*, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983), that regulations affecting an inmate's free-exercise right be "reasonably adapted" to achieving an important penological objective.

prisoners in adhering to their religious beliefs and give guidance to prison administrators in adopting policies that comply with constitutional standards, while at the same time appropriately deferring to their judgment in matters related to institutional security. *Id.*

The district court disposed of Caldwell's free-exercise claim on summary judgment. Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, admissions and affidavits "show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see P.H. Glatfelter Co. v. Voith, Inc.,* 784 F.2d 770 (7th Cir.1986); *Box v. A & P Tea Co.,* 772 F.2d 1372 (7th Cir.1985). In addition, we must view the record and any reasonable inferences drawn from it in the light most favorable to the non-moving party. *Box,* 772 F.2d at 1375; *Munson v. Friske,* 754 F.2d 683, 690 (7th Cir.1985). After a thorough examination of the record, we find that there exist genuine issues of material fact concerning Caldwell's free-exercise claim, and hold that the district court's grant of summary judgment was improper.

In support of his motion for summary judgment, Miller submitted a four-page affidavit of Randy J. Davis, a paralegal specialist at Marion. Davis recited the events precipitating the lockdown, and averred to the fact that a Bureau task force was subsequently convened to "review the mission, security and operational procedures" at Marion. Davis stated further that the task force recommended that Marion retain its level-six classification, and that a number of changes in the operation of the institution be made to secure, as he puts it, "a safer environment for both the inmate population and staff." Davis also stated that

"[i]ndividual television sets have been approved for each inmate in general population and once installed, funds have been appropriated to provide religious programming for each religion, if available, via the television sets." [12]

In opposition to Miller's motion for summary judgment, Caldwell submitted the affidavit of Reverend West Lamb, who had been a chaplain at Marion for a period extending from before the October 28 lockdown to approximately nine months thereafter. Reverend Lamb averred to the importance of Mass, a congregational service, to Catholic life, and to the sincerity of Caldwell's religious beliefs. Reverend Lamb also stated that "the distribution of Holy Communion to Mr. Caldwell through his cell door should not and cannot be construed as an acceptable alternative or substitute for his direct and personal participation in Mass." Miller does not challenge either the sincerity of Caldwell's beliefs or the importance of congregate religious services to the Catholic faith.[13]

On the basis of the affidavit submitted by Miller, it is not possible to determine whether a total ban on group religious activities is warranted by security considerations at Marion. Challenges to prison restrictions that are alleged to inhibit the First Amendment rights of inmates "must be analyzed in terms of the legitimate policies and goals of the corrections system." *Pell,* 417 U.S. at 822, 94 S.Ct. at 2804. It is critically important then that the record reveal the manner in which security considerations are implicated by the prohibited activity. *See, e.g., Weaver v. Jago,* 675 F.2d 116, 118–19 (6th Cir.1982); *Dreibelbis v. Marks,* 675 F.2d 579, 581 (3d Cir.1982). This is not to say that an issue such as that before us now can never be

**12.** As we noted earlier, we do not know what changes the task force recommended, or whether those recommendations were adopted by officials at Marion. We also do not know whether the closed-circuit television system for religious broadcasts has been installed.

**13.** At the oral argument on Miller's motion, Caldwell stated that there were no organized group religious activity of any sort at Marion, and that he was provided "the very, very barest type of communication with the Priest." When asked by the court whether the total ban on congregational services was permanent or temporary, the Assistant U.S. Attorney replied "at this time I would not be able to make that representation whether or not it's permanent."

decided on summary judgment. *See, e.g., McDonald v. Hall,* 579 F.2d 120, 121 (1st Cir.1978) (inmates held in disciplinary detention); *Sweet v. South Carolina Department of Corrections,* 529 F.2d 854, 864 (4th Cir.1975) (same). Rather, the governmental interest asserted in support of a restrictive policy must be sufficiently articulated to allow for meaningful review of the regulation in question and its effect on the inmate's asserted rights.[14]

■ The sole evidence offered by Miller in regard to Caldwell's free-exercise claim was Davis's affidavit. There is no indication that Davis, a paralegal specialist, possesses any degree of expertise as to matters of prison security. Nor does he state that he is responsible for making the type of discretionary decision at issue here. *See St. Claire v. Cuyler,* 634 F.2d 109, 115 (3rd Cir.1980). Miller submitted no further affidavits in response to Reverend Lamb's affidavit. It is true Davis averred that, following the lockdown, a Bureau task force recommended a number of changes in the operation of Marion. He did not state, however, nor do we find any conclusive mention elsewhere in the record of, the nature of those changes, whether Marion officials had adopted them, or what specific security or operational considerations support them. Davis did not even indicate whether a ban on group religious activities was recommended by the Bureau task force, or whether it grew out of the task force's other recommendations. In addition, Miller did not append a copy of the task force's findings, recommendations, or report to his motion for summary judgment. In short, Davis's affidavit offers no

insight into why group religious services threaten the security or operation of Marion.

The evidence, what little there may be, offered by Miller to support the ban on group religious activities is defective for another fundamental reason: Davis's affidavit related only to the period immediately following the lockdown at Marion. Miller makes no attempt to substantiate whether the conditions that in his judgment necessitated the lockdown had persisted to the time of the oral argument on his motion for summary judgment, some nine months later. It is undoubtably easier to justify restrictions on group religious activities during the period immediately following a declared state of emergency, *see, e.g., Walker v. Mintzes,* 771 F.2d 920, 930–31 (6th Cir.1985); *Rogers v. Scurr,* 676 F.2d 1211, 1216 (8th Cir.1982), but it is yet another question whether security concerns warrant a permanent ban. *Walker,* 771 F.2d at 930–31; *Rogers,* 676 F.2d at 1216 ("prisoners in the general population may, consistent with the first amendment, be denied all congregate religious services during the normal course of the operation of a prison only when paramount security interest [sic] so dictate"); *Arsberry,* 586 F.2d at 44; (restrictions on group religious services for inmates in disciplinary segregation permissible so long as adequate alternatives are available). Hence, it is imperative that Miller on remand introduce evidence relating to the present need for a total ban on group religious services.

In sum, neither we nor the district court have any way of determining, based on the

---

14. Davis, the paralegal specialist at Marion, stated that the "October 28, 1983, declaration of emergency was both justified and reasonable. Staff, prior to making their decision, considered the October 22, 1983, staff murders and the October 27, 1983, staff assaults and inmate killing. Staff considered, as an overview, all the serious inmate disturbances/assaults since 1980 and particularly those incidents which have occurred since July 1983." Davis does not, however, indicate whether these incidents were connected to the security matters implicated by group religious services.

The Supreme Court has repeatedly held that routine and automatic arguments to the effect that "every step taken to protect constitutional rights of prisoners will lead to a breakdown in institutional discipline and security" are inadequate to support restrictive prison regulations or policies. *See, e.g., Cleavinger v. Saxner,* —— U.S. ——, ——, 106 S.Ct. 496, 504, 88 L.Ed.2d 507 (1985); *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974); *Johnson v. Avery,* 393 U.S. 483, 486–87, 89 S.Ct. 747, 749–50, 21 L.Ed.2d 718 (1969). We find that Miller's argument falls squarely within the Supreme Court's caveat.

record, whether the continuing ban on group religious activities at Marion was reasonably adapted to achieving an important correctional goal. *See Childs,* 705 F.2d at 920; *Madyun,* 704 F.2d at 960. The interest in preserving order and authority in a prison is self-evident, *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 132; 97 S.Ct. 2532, 2541, 53 L.Ed.2d 627 (1977), and internal security is "central to all other correctional goals." *Pell,* 417 U.S. at 823, 94 S.Ct. at 2804. Nonetheless, in the absence of evidentiary support, Miller's assertion that a total ban on all group religious services is and was reasonably necessitated by security considerations is conclusory, and hence, an insufficient basis for summary judgment.

■■■ On remand, Miller need not demonstrate that group religious services pose a "present danger to security and order," *see Jones,* 433 U.S. at 128, 97 S.Ct. at 2539; rather, he must introduce evidence that such services constitute a threat of potential violence or are disruptive of institutional security. *Id.* at 132, 97 S.Ct. at 2541. That evidence may take many forms. It may, for example, consist of the expert testimony of prison officials routinely responsible for exercising the discretionary authority at issue here. *St. Claire,* 634 F.2d at 114. As noted above, that evidence must relate not only to the circumstances surrounding the lockdown, but, more importantly, to the present state of affairs at Marion as well.

In assessing the adequacy of the evidence adduced, the district court should be particularly mindful that the lockdown, and resultant ban on group religious activities, was not precipitated by a general strike or riot, *see, e.g., Walker,* 771 F.2d at 930, but rather by a series of incidents involving individual inmates. It is conceivable that the passage of time, here over two-and-one-half years, has not alleviated the necessity for extraordinary security precautions. Marion is the only level-six institution in the federal penitentiary system, and we have often noted that security considerations there are unique. *See, e.g., Campbell*

*v. Miller,* 787 F.2d 217, 227 (7th Cir.1986); *United States v. Silverstein,* 732 F.2d 1338, 1342–43 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985); *Garza,* 688 F.2d at 482; *Bono v. Saxbe,* 620 F.2d 609, 611 (7th Cir.1980). It is quite possible that the very nature of Marion and the type of inmate housed there, or other special circumstances, may call for security measures not needed in other penitentiaries, and hence, justify a permanent ban on group religious activities. *See Walker,* 711 F.2d at 931.

As the Supreme Court noted in *Hewitt,* 459 U.S. at 474, 103 S.Ct. at 872–73:

> In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and long-standing relations between prisoners and guards, prisoners *inter se,* and the like. In the volatile atmosphere of a prison ... imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on "purely subjective evaluations and on predictions of future behavior," *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 464, 101 S.Ct. 2460, 2464 [69 L.Ed.2d 158] (1981); indeed, the administrators must predict not just one inmate's future actions, as in parole, but those of an entire institution.

■■■ Hence, we do not mean to foreclose the argument that the indicents leading up to the lockdown, although limited to a few inmates, reflected an irreversible change in the institutional character of Marion. The First Amendment requires, however, that security considerations advanced to support a restrictive policy be directly implicated by the protected activity, and sufficiently articulated to permit meaningful constitutional review. *Pell,* 417 U.S. at 822, 94 S.Ct. at 2804. Once prison officials have satisfied this burden

by introducing evidence of this nature, we must defer to their judgment, unless the inmate can demonstrate that these officials have exaggerated their response to those security considerations, *id.* at 827, 94 S.Ct. at 2806, or that they are unreasonable in their belief that these considerations are implicated. *Jones,* 433 U.S. at 128, 97 S.Ct. at 2539.

For the reasons stated above, we hold that the district court erred in granting summary judgment against Caldwell on his free-exercise claim, and remand for further proceedings on the issue of whether the total ban on all group religious activities is and was reasonably adapted to important and legitimate security considerations implicated by such activities at Marion.

B. CRUEL AND UNUSUAL PUNISHMENT.

Immediately following the October 23, 1983, lockdown, all indoor and outdoor recreation and exercise privileges were suspended, and Caldwell was confined to his cell twenty-four hours a day. Approximately one month later, Caldwell and the other inmates were permitted one hour of daily indoor exercise. By May of 1984, seven months after the lockdown, Caldwell was given an hour of weekly outdoor exercise in addition to that allowed indoors. In June of 1984, Caldwell's outdoor exercise privileges increased to two hours weekly, but for each hour spent outdoors he received an hour less indoors.[15] Caldwell claims that these restrictions constitute cruel and unusual punishment in violation of the Eighth Amendment. We disagree.

■■■ The Eighth Amendment prohibits punishments that involve the unnecessary and wanton infliction of pain, are grossly disproportionate to the severity of the crime for which an inmate was imprisoned, or are totally without penological justification. *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d

59 (1981). Because conditions of confinement are part of the penalty imposed upon criminal offenders, they too fall within the ambit of the Eighth Amendment. *Whitley v. Albers,* —— U.S. ——, ——, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986); *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399; *French v. Owens,* 777 F.2d 1250, 1251 (7th Cir. 1985). It is immaterial whether such conditions result from restrictions imposed for administrative, rather than punitive, reasons. *Bono,* 620 F.2d at 612; *see also Spain v. Procunier,* 600 F.2d 189, 199 (9th Cir.1979); *Preston v. Thompson,* 589 F.2d 300 (7th Cir.1978).

■■■ The Eighth Amendment does not provide a fixed formula for determining whether the effect of particular conditions constitutes cruel and unusual punishment, but rather "'draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society.'" *Rhodes,* 452 U.S. at 346, 101 S.Ct. at 2399 (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)). Conditions, alone or in combination, that do not, however, fall below the contemporary standards of decency, are not unconstitutional, and "[t]o the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Id.* 452 U.S. at 347, 101 S.Ct. at 2399.

In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court held that the deliberate denial of medical care is cruel and unusual punishment because, in the worst case, it can result in physical torture, and even in less serious cases, it can result in pain without any penological purpose. Something less than the deliberate denial of medical care, however, such as a prolonged restriction on exercise that threatens an inmate's physical health, might also violate the Eighth Amendment. *Cf. French,* 777 F.2d at 1255 ("Where movement is denied and muscles

---

**15.** In his affidavit, Davis stated that "[p]hysical plant changes are currently being implemented which will allow increased opportunities for out-of-cell recreation. Some of these physical plant changes include modifications to the outside yard area which has been completed and now is in its initial operation, recreation V.T. area and gym." We have no way, based on the record, of knowing what these facilities are, or how access to them will be regulated.

are allowed to atrophy, the health of the individual is threatened and the state's constitutional obligation is compromised.") The restriction that Caldwell may exercise outside his cell for one hour a day falls short of demonstrating a deliberate indifference to his serious medical needs. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291; *see also Wellman v. Faulkner,* 715 F.2d 269, 271 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984). As the Supreme Court recently emphasized, "[t]o be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety.... It is obduracy and wantonness ... that characterizes the conduct prohibited by the Cruel and Unusual Punishment Clause, [even where] that conduct occurs with establishing conditions of confinement." *Whitley,* —— U.S. at ——, 106 S.Ct. at 1084.

■■ Caldwell has neither alleged nor argued that the exercise restrictions have inflicted unnecessary or wanton pain on him, or are grossly disproportionate to the severity of the crime for which he was imprisoned. *Rhodes,* 452 U.S. at 348, 101 S.Ct. at 2400. Nor can we say that the restrictions are totally without penological justification. We "cannot assume that ...

prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system." *Id.* at 352, 101 S.Ct. at 2402. The Constitution does not mandate that prisons be comfortable, and a prison such as Marion, which houses persons convicted of serious crimes and who have demonstrated a propensity to violence or escape, *see, e.g., Garza,* 688 F.2d at 482, cannot be free of discomfort. *Rhodes,* 452 U.S. at 349, 101 S.Ct. at 2400; *Smith v. Fairman,* 690 F.2d 122, 125–26 (7th Cir.1982), *cert. denied,* 461 U.S. 946, 103 S.Ct. 2125, 77 L.Ed.2d 1304 (1983).

■■ Caldwell has failed to raise a genuine issue of fact as to whether the exercise restrictions he challenges result in more than inconvenience and discomfort. As such, these restrictions fall outside the scope of the Eighth Amendment, and the district court properly granted summary judgment in favor of Miller.[16]

## C. PROCEDURAL DUE PROCESS.

Caldwell contends that the lockdown restrictions had been in effect for over five months at the time he filed his complaint and have continued, with only slight modifications, to the present.[17] He has alleged

---

16. Caldwell also claims that, taken together, the conditions he challenges, *viz.,* the restricted exercise privileges, the ban on religious services, the suspension of contact visitation, and the direct access restriction on the use of the law library, constitute cruel and unusual punishment.

We held that the exercise restrictions are constitutional. Caldwell concedes that the suspension of contact visitation is not *per se* unconstitutional. *See Block v. Rutherford,* 468 U.S. 576, ——, 104 S.Ct. 3227, 3234, 82 L.Ed.2d 438 (1984). Insofar as Caldwell's free-exercise and legal-access claims might prove meritorious, adequate relief is available to him under the applicable constitutional provisions. We, therefore, shall consider the cumulative effect of these latter conditions under the assumption that they do not fall below constitutional standards.

So considered, the total effect of the conditions Caldwell challenges neither result in an "unquestioned and serious deprivation of basic human needs," *Rhodes v. Chapman,* 452 U.S. 337, 348, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59

(1981), nor do they cause intolerable or shocking prison conditions. *Id.* 452 U.S. at 347, 101 S.Ct. at 2399; *Wells v. Franzen,* 777 F.2d 1258, 1264 (7th Cir.1985). As we have noted, mere "inactivity, lack of companionship and a low level of intellectual stimulation do not constitute cruel and unusual punishment." *Bono v. Saxbe,* 620 F.2d 609, 614 (7th Cir.1980).

17. As we have previously noted, both parties indicate that the lockdown restrictions at Marion have been modified since appeal was taken. At oral argument before this court the Assistant U.S. Attorney indicated that substantial changes had been made such as would moot Caldwell's prayer for injunctive relief as to most of his claims. The record, however, is silent as to the nature and scope of any changes that might ameliorate the conditions of Caldwell's confinement. Nonetheless, as the following textual discussion explains, any uncertainty as to the degree to which conditions at Marion have been improved is immaterial to the disposition of Caldwell's due-process claim. As the record re-

further that some of the restrictions "impose severe infringements on [his] constitutional rights." He claims that the continuation of the lockdown without providing him a statement of reasons for the continuation and an opportunity for him to respond thereto, violates his right to procedural due process under the Fifth Amendment.

■ The Fifth Amendment prohibits the federal government from depriving a person of life, liberty, or property without due process of law. In order to analyze Caldwell's claim, we must determine (1) whether the procedural protections of the Due Process Clause are implicated by the prolonged lockdown at Marion, and (2) if so, what process is due. *See, e.g., Cleveland Board of Education v. Loudermill,* —— U.S. ——, ——, 105 S.Ct. 1487, 1491–93, 84 L.Ed.2d 494 (1985); *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *Shango v. Jurich,* 681 F.2d 1091 (7th Cir.1982).

■ For the purposes of the Due Process Clause, a liberty interest may be either of two types: interests protected by the Due Process Clause itself, *see, e.g., Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (transfer to mental hospital); *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (revocation of probation); *Morrissey,* 408 U.S. at 481, 92 S.Ct. at 2600 (revocation of parole); or interests created by state and federal law. *See, e.g., Hewitt,* 459 U.S. at 469–72, 103 S.Ct. at 870–71 (confinement of inmates to administrative segregation); *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (denial of parole); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (good-time credits). Caldwell has neither alleged, nor does he argue, that the prolonged lockdown deprived him of a

liberty interest created by statute or regulation. Thus, we shall consider only whether he has a liberty interest protected by the Due Process Clause, independent of statutes or regulations.

■ We acknowledge that the lockdown restrictions significantly impair Caldwell's ability to associate with other inmates, to entertain outside visits, to move about within Marion, to exercise outside his cell, and, possibly, to worship. Yet, that does not end the inquiry. The determinative factor in a Due Process Clause analysis is the nature of the interest involved, not its weight. *See, e.g., Greenholtz,* 442 U.S. at 7, 99 S.Ct. at 2103; *Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); *Morrissey,* 408 U.S. at 481, 92 S.Ct. at 2600; *Board of Regents v. Roth,* 408 U.S. 564, 570–71, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972). Even assuming that the lockdown restrictions caused Caldwell to suffer a substantial personal deprivation, it in no way follows that these restrictions trigger the procedural protections of the Due Process Clause. *Hewitt,* 459 U.S. at 467–68, 103 S.Ct. at 869; *Olim v. Wakinekona,* 461 U.S. at 238, 245, 103 S.Ct. 1741, 1745 (1983); *Meachum,* 427 U.S. at 225, 96 S.Ct. at 2538. This is so irrespective of whether that deprivation might be characterized a "grievous loss." *Jago v. Van Curen,* 454 U.S. 14, 17, 102 S.Ct. 31, 34, 70 L.Ed.2d 13 (1981). To hold otherwise "would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than that of the federal courts." *Meachum,* 427 U.S. at 225, 96 S.Ct. at 2538.

Freedom of bodily movement lies at the core of the liberty protected by the Due Process Clause from arbitrary government actions.[18] *See Youngberg v. Romeo,* 457

---

veals, the lockdown restrictions did not qualitatively change the conditions of Caldwell's confinement, and hence, fall within the permissible bounds of official discretion.

**18.** The range of liberty interests encompassed by the Due Process Clause is, of course, much

broader than restrictions on bodily movement *per se.* As the Supreme Court in *Board of Regents v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 2706–07, 33 L.Ed.2d 548 (1972), observed:

"While this court has not attempted to define with exactness the liberty ... guaranteed [by the Fourteenth Amendment], the term has re-

U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Ingraham v. Wright,* 430 U.S. 651, 673–74, 97 S.Ct. 1401, 1413–14, 51 L.Ed.2d 711 (1977); *see also Scott v. Village of Kewaskum,* 786 F.2d 338 (7th Cir.1986); *Wells,* 777 F.2d at 1261. "[T]hat right is not extinguished by lawful confinement, even for penal purposes." *Youngberg,* 457 U.S. at 315, 102 S.Ct. at 2458; *see Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). Obviously, a valid conviction empowers the government "to confine [a person] and to subject him to the rules of its prison systems so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum,* 427 U.S. at 224, 96 S.Ct. at 2538. It is now well settled that, in the absence of a claim of entitlement under state or federal law, a prisoner cannot invoke due-process safeguards to challenge his initial assignment to a corrections facility, *id.* at 224, 96 S.Ct. at 2538, or to question his transfer from one institution to another,[19] whether intrastate, *id.,* or interstate, *Olim,* 461 U.S. at 245–46, 103 S.Ct. at 1745–46; *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976); *Shango,* 681 F.2d at 1098.

■ Nonetheless, as we noted above, a prisoner, following his conviction and incarceration, retains a residuum of constitutionally protected liberty interests that are independent of state or federal law. *Hewitt,* 459 U.S. at 466–67, 103 S.Ct. at 869; *Wolff,* 418 U.S. at 555–56, 94 S.Ct. at 2974–75. The range of interests so retained, however, is narrow, and encompass-

ceived much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men." [quoting *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923).] In a Constitution for a free people, there can be no doubt that the meaning of "Liberty" must be broad indeed.

es no more than the most basic liberties. *Olim,* 461 U.S. at 244–46, 103 S.Ct. at 1745–46; *Hewitt,* 459 U.S. at 466–67, 103 S.Ct. at 869. "[A]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentenced imposed upon him ... the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye,* 427 U.S. at 242, 96 S.Ct. at 2547; *see also Olim,* 461 U.S. at 247–48, 103 S.Ct. at 1746–47; *Hewitt,* 459 U.S. at 466–68, 103 S.Ct. at 869; *Meachum,* 427 U.S. at 225, 96 S.Ct. at 2538. It is only when a change in the conditions of confinement "brings about consequences qualitatively different from the punishment suffered by a person convicted of a crime," *Vitek,* 445 U.S. at 493, 100 S.Ct. at 1264, that the residuum of liberty interests protected by the Due Process Clause is implicated, and the question arises as to whether additional due-process protections were afforded, and whether they were adequate under the circumstances.

■ Caldwell calls upon us to determine whether his interest in the continuation of the pre-lockdown conditions at Marion falls within that narrow range of basic liberties. Thus, distilled to its constitutional premise, Caldwell's argument rests upon the assumption that the procedural safeguards afforded him at the time he was validly convicted do not encompass a change in the conditions of his confinement in the nature of that brought about by the lockdown. That is, Caldwell is arguing

In *Bolling v. Sharpe,* 347 U.S. 497, 499–500, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954), the Court noted that:

Liberty under law extends to the full range of conduct which the individual is free to pursue, and it cannot be restricted except for a proper governmental objective.

19. Of course, the fact that decisions to confine a prisoner, or to transfer him, do not implicate a liberty interest under the Due Process Clause, does not mean that such actions may be initiated for constitutionally impermissible reasons. *See, e.g., Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983); *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2548, 49 L.Ed.2d 466 (1976).

that the lockdown conditions fall outside the normal limits or range of custody which his conviction has authorized the government to impose upon him. We disagree.

As we noted above, the transfer of an inmate cannot be challenged under the Due Process Clause in and of itself. This is true even when the change in facilities brings about significantly more restrictive conditions of confinement. *Olim,* 461 U.S. at 248 n. 9, 103 S.Ct. at 1747 n. 9; *Meachum,* 427 U.S. at 225, 96 S.Ct. at 2538. In *Hewitt,* 459 U.S. at 467, 103 S.Ct. at 869, the Supreme Court, in concluding that confining an inmate to administrative segregation did not trigger the procedural protections of the Due Process Clause, noted that, "there is little question that segregation added to the restraints on his freedom." In *Hewitt,* the inmate claimed, as does Caldwell here, that the restricted confinement "imposed severe hardship on him [*viz.,* among other things] he alleged a denial of access to vocational, educational, recreational, and rehabilitative programs, restrictions on exercise, and confinement to his cell for lengthy periods of time." [20] *Id.* The Court observed that "[i]t is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Id.* at 468, 103 S.Ct. at 869–70.

In *Vitek,* 445 U.S. at 493–94, 100 S.Ct. at 1264, the Supreme Court held that the involuntary transfer of an inmate from a corrections institution to a mental hospital implicated the inmate's retained liberty interests, and thus triggered the procedural protections of the Due Process Clause. The Court noted that such a transfer resulted in a "massive curtailment of liberty," and caused adverse social consequences to the inmate. *Id.* at 491–92, 100 S.Ct. at 1263. The Court reasoned that none of its prior decisions held that convic-

tion for a crime entitled the government to adjudge an inmate mentally ill and subject him to institutional care in a mental hospital. *Id.* at 493, 100 S.Ct. at 1264. "Such consequences," the Court concluded, "are *qualitatively different from the punishment characteristically suffered by a person convicted of crime." Id.* (emphasis added).

The Court, however, noted that:

Many of the restrictions on the prisoner's freedom at the [mental hospital] by themselves might not constitute the deprivation of a liberty interest retained by a prisoner.... [b]ut here, the stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment, coupled with the subjection to mandatory behavior modification as a treatment for mental illness, constitute the kind of liberty that requires procedural protections.

*Id.* at 494, 100 S.Ct. at 1264. The Court reaffirmed, nonetheless, that "[i]t is also true that changes in the conditions of confinement having a substantial adverse impact on the prisoner are not alone sufficient to invoke the protections of the Due Process Clause." *Id.* at 492, 100 S.Ct. at 1263.

Under the guidelines set forth by the Supreme Court, we must look to the nature, not the weight of a claimed deprivation. *Greenholtz,* 442 U.S. at 7, 99 S.Ct. at 2103; *Meachum,* 427 U.S. at 224, 96 S.Ct. at 2538; *Morrissey,* 408 U.S. at 481, 92 S.Ct. at 2600; *Roth,* 408 U.S. at 564, 92 S.Ct. at 2705–06. The difference between the pre- and post-lockdown conditions at Marion is one of degree and not of kind. Even assuming that the lockdown restrictions are permanent, it cannot be said that they brought about conditions of confinement that are qualitatively different from the punishment characteristically suffered

---

**20.** The dissent in *Hewitt* indicated that an inmate in administrative segregation had approximately five to ten minutes a day for out-of-cell exercise only three to four days a week. *Hewitt*

*v. Helms,* 459 U.S. 460, 479–80 n. 1, 103 S.Ct. 864, 875–76 n. 1, 74 L.Ed.2d 675 (1983) (Stevens, J., dissenting).

by a convict.[21] *Hewitt*, 459 U.S. at 467–68, 103 S.Ct. at 869; *Vitek*, 445 U.S. at 493, 100 S.Ct. at 1264. These conditions in no way constitute an additional punishment. Nor can it be said that they intrude upon Caldwell's personal security in a way that would set them apart from normal confinement, unlike the action of prison officials challenged in *Vitek*, 445 U.S. at 492, 100 S.Ct. at 1263. As such, the continuation of the lockdown restrictions does not implicate a protected liberty interest, and is hence not subject to judicial review under the Due Process Clause.[22] We, therefore, hold that the district court properly granted summary judgment against Caldwell on his procedural due process claim.

### D. ACCESS TO THE COURTS.

Immediately following the lockdown at Marion, Caldwell and the other general population inmates were no longer allowed direct access to the main law library. Instead, they were required to give exact citations to caselaw materials, or the full title of legal treatises they needed, and these were then provided them. Caldwell claims that this system remained in effect for nine months following the lockdown.

In July 1984, prison officials allegedly implemented a system of "basic libraries." Under this system, Caldwell and the other inmates have direct access to research and reference materials available in the smaller basic libraries in order to initiate research, and may then request specific caselaw materials from the main law library in accordance with the paging system described above. Caldwell may request three volumes at a time, and subject to demand for particular volumes, he will receive requested material within twenty-four hours, and may likewise retain them for twenty-four hours. Caldwell claims that the legal-ac-

**21.** In support of his due-process claim, Caldwell relies exclusively upon our decision in *La Batt v. Twomey*, 513 F.2d 641 (7th Cir.1975). There we held that a nine-day lockdown did not implicate the procedural protections of the Due Process Clause, but noted in *dictum* that were the lockdown to "extend over a sufficiently prolonged period of time, [the] inmates ... must be granted an opportunity to vindicate their right to be informed of the reasons justifying their continuing state of confinement and afforded a reasonable opportunity to respond thereto." *Id.* at 646. We concluded that such a "result is consistent with those cases considering the due process limitations on prison officials' power to transfer inmates to other institutions, which have concluded that ... due process protections are required at a reasonably prompt time after the transfer has been effectuated." *Id.* at 646 n. 5.

In *La Batt*, the Illinois Department of Corrections had promulgated regulations that might be said to have set forth factual predicates for the imposition of a lockdown. Insofar as we relied in *La Batt* upon these regulations in concluding that a prolonged lockdown might implicate the Due Process Clause, our analysis was not inconsistent with that employed by the Supreme Court when called upon to determine whether particular enactments create a protected liberty interest. *See, e.g., Olim v. Wakinekona*, 461 U.S. 238, 248–49, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983); *Hewitt v. Helms*, 459 U.S. 460, 469–72, 103 S.Ct. 864, 869–71, 74 L.Ed.2d 675 (1983); *Wolff v. McDonnell*, 418 U.S. 539, 556–58, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974).

In *La Batt*, we also drew support from our earlier decision in *United States ex rel. Miller v. Twomey*, 479 F.2d 701 (7th Cir.1973), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974). In *Twomey*, we suggested that the Supreme Court's decision in *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), "requires that due process precede any substantial deprivation of the liberty of persons in custody." *Twomey*, 479 F.2d at 713. *Twomey* was decided without the benefit of the Supreme Court's later decisions in, for example, *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983).

**22.** In holding that the change in conditions at Marion does not implicate a protected liberty interest, we have not foreclosed a claim that specific restrictions, or the cumulative effect of such restrictions, violate other substantive rights protected by the Constitution. "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 2982, 41 L.Ed.2d 935 (1974). The fact that the Constitution places substantive limitations on the conditions under which an inmate may be confined by the government does not mean that the state must conduct a hearing, or provide any other additional due-process protections, either before or after placing an inmate in such conditions. The proper forum for adjudicating a challenge to conditions of confinement such as those involved here is a court of law, not a prison administrative board. *See Shango v. Jurich*, 681 F.2d 1091, 1098 n. 13 (7th Cir.1982).

cess program at Marion is unconstitutional, because the exact-cite paging system is an inadequate substitute for direct access to the main law library.

As we recently observed in *Campbell v. Miller*, 787 F.2d 217, 225–26 (7th Cir. 1986):

It is beyond dispute that [an inmate] has a constitutional right of access to counsel and to the courts for pursuing post-conviction remedies and for challenging the conditions of his confinement. *Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977); *Wolff*, 418 U.S. 578–80, 94 S.Ct. at 2985–86 (extends right to access to civil-rights actions; *Procunier v. Martinez*, 416 U.S. 39 ', 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974); *Johnson v. Avery*, 393 U.S. 483, 485, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969). Officials at Marion have an affirmative duty to provide constitutionally adequate access, *Bounds*, 430 U.S. at 829, 97 S.Ct. at 1498, and bear the burden of demonstrating the adequacy of the means they choose. *Buise v. Hudkins*, 584 F.2d 223, 228 (7th Cir.1978), *cert. denied*, 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979).

[An inmate's] right of access, however, is not unconditional. *Green v. Warden, U.S. Penitentiary*, 699 F.2d 364, 369 (7th Cir.1983). The constitutionally relevant benchmark is *meaningful*, not total or unlimited access. *Bounds*, 430 U.S. at 823, 97 S.Ct. at 1495; *Wolff*, 418 U.S. at 578–79, 94 S.Ct. at 2986; *Green*, 699 F.2d at 370. In *Bounds*, the Supreme Court framed the inquiry as:

whether law libraries or other forms of legal assistance are needed to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.

*Id.* 430 U.S. at 825, 97 S.Ct. at 1496; *see also Johnson v. Brelji*, 701 F.2d 1201, 1208 (7th Cir.1983) (footnotes omitted).

We held in *Campbell* that the lack of direct access to the main law library does not *per se* render a legal-access program

unconstitutional. In the instant case, Caldwell and the other inmates in the general population allegedly have direct access to the basic law libraries. Such a library is designed to facilitate the initial steps of legal research, *viz.*, the formulation of tentative theories and the notation of materials needed to be consulted, which materials Caldwell may request from the main law library. Caldwell does not argue that his access to the basic library is inadequate in terms of the number of visits he is allowed or the amount of time he may remain in the library at any one time.

▆▆▆ Caldwell claims that the basic law libraries cannot serve as a substitute for direct access to the main law library. We do not agree. The basic law libraries, if they contain the materials listed in the appendix to the affidavit filed in support of Miller's motion for summary judgment (reproduced in Appendix to this opinion), are adequate to provide Caldwell with the citations he needs to request caselaw materials and to complete his research. Restrictions on direct access to legal materials may be justified in light of legitimate security considerations. *Campbell*, at 226–29; *see also Procunier v. Martinez*, 416 U.S. 396, 420, 94 S.Ct. 1800, 1814–15, 40 L.Ed.2d 224 (1974). As we noted at the outset, Marion presents unique disciplinary and security considerations. This is true whether one is dealing with general population inmates or with those in the Control Unit. Because we find that the direct-access restrictions do not render Caldwell's access to the courts, as a general matter, unmeaningful, and that these restrictions are supported by legitimate security considerations, we will defer to the judgment of Marion officials in adopting the procedures they have. *Procunier*, 416 U.S. at 420, 94 S.Ct. at 1884; *Bell v. Wolfish*, 441 U.S. at 555, 99 S.Ct. at 1882; *Campbell*, at 226.

▆▆▆ This, however, does not fully dispose of Caldwell's access claim. Caldwell was initially convicted and sentenced under, and hence needs access to, District of Columbia law in order to pursue post-conviction remedies. He argues that the dis-

trict court erred in assuming that the reinstatement of the "Shawnee Plan" would, without more, remedy the lack of District of Columbia caselaw in the main law library. Under the Shawnee Plan, prisoners needing caselaw materials not available in the main law library may request, by exact cite, the materials from the Shawnee Law Library, and photocopies of these materials would be provided them. Caldwell claims, therefore, that summary judgment was improper on the basis of the affidavit submitted by Miller, and that there remain genuine issues of material fact in regard to his access claim.

We agree with Caldwell to the extent that factual issues remain as to the availability of District of Columbia caselaw materials, and as to whether there are sufficient reference and research materials available to him to obtain cites to the caselaw materials he needs.[23] If the exact-cite system is supplemented by adequate reference materials in the basic law library, then the use of a law library outside Marion to provide access to District of Columbia case materials is constitutionally permissible. If, however, the basic law library system has not been implemented, or if the libraries do not contain the materials they have been represented to contain, then the constitutionality of the legal-access program is placed into question. In either case, Caldwell would be able to pursue that part of his access claim on remand. Thus, we hold that the district court erred in granting Miller's motion for summary judgment on that part of Caldwell's claim regarding the adequacy of his access to District of Columbia caselaw. In addition, if the conditions we have noted above as to the availability of adequate reference materials in the basic law libraries are not satisfied, then Caldwell may pursue his general challenge to the adequacy of Marion's legal-access program.

### E. CONFISCATION OF LEGAL AND RELIGIOUS BOOKS.

Shortly following the lockdown, prison officials at Marion confiscated all hardbound books in the possession of inmates. Apparently, the inmates were given notice only five minutes prior to the confiscations. Caldwell's personal law and religious books were taken. All inmates, including Caldwell, were told that, at the inmate's option, officials would either (1) send the confiscated books to an inmate's family, (2) donate the books to an outside organization, or (3) destroy them. Caldwell has no family to whom he could have had his books sent, nor did he wish that they be destroyed. He was not given the chance to have the books sent to friends outside Marion. Faced with the available options, Caldwell specified outside charitable organizations to which prison officials could donate the books. Approximately two months later, inmates were once again allowed to keep hardbound books in their cells.

The district court granted summary judgment against Caldwell on his confiscation claim for a number of reasons. The court noted first that Caldwell's claim was for injunctive relief only, and that he had not sought damages for the loss of his property. The court then stated that Caldwell had neither exhausted his administrative remedies, "nor filed an administrative tort claim." Hence, the court concluded that Caldwell's claim was "not proper for extraordinary, injunctive relief." The court, citing to *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and pointing out the existence of the Federal Tort Claims Act, concluded that injunctive relief would have been inappropriate anyway, because Caldwell had an adequate remedy at law. Finally, the district court noted that "inmates have no legitimate entitlement to items of property confiscated pursuant to prison policy."

---

**23.** In *Corgain v. Miller*, 708 F.2d 1241 (7th Cir. 1983), we held constitutionally inadequate the plan then in place at Marion for providing access to state caselaw materials. That plan required inmates to give exact cites to the materials they needed, but did not provide for the basic reference materials necessary to obtain the cites.

■ Caldwell argues, and we agree, that his complaint, read in the light most favorable to him, stated a claim for damages arising out of the constitutional violations he alleged, and not merely for injunctive relief. Moreover, Caldwell alleged that he exhausted his administrative remedies. Yet the district court found that at the June 26, 1984, hearing on Miller's motion for summary judgment, "Caldwell admitted that he had not exhausted his remedies." After a thorough examination of the transcript, we could not find that Caldwell had made such an admission. Hence, we conclude that the district court erred both in finding that Caldwell did not exhaust his administrative remedies, and in holding that he had not sought damages through his complaint.

The district court's reliance on *Parratt* is also unavailing. In *Parratt*, the Supreme Court held that, although the negligent loss of an inmate's property by prison officials constituted a "deprivation" within the meaning of the Due Process Clause, the State's post-deprivation tort remedy provided the process that was due.[24] Subsequently, in *Hudson v. Palmer*, 468 U.S. at ——, 104 S.Ct. at 3204, the Court held that "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause ... if a meaningful postdeprivation remedy for the loss is available.... [T]he State's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy." Caldwell's due-process claim, however, does not rest on the proposition that prison officials made a mistake, or were negligent in doing what they did. Rather, Caldwell challenges the underlying policy that led to the confiscation of his books. *Parratt* does not reach a challenge to policy. *Hudson*, 468 U.S. at ——, 104 S.Ct. at 3203; *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 435–36, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265 (1982);

*Toney-El v. Franzen*, 777 F.2d 1224, 1227–28 (7th Cir.1985).

Caldwell, as an inmate, "may claim the protection of the Due Process Clause to prevent ... deprivation of ... [his] property without due process of law." *Bell v. Wolfish*, 441 U.S. at 545, 99 S.Ct. at 1877; *see also Meachum*, 427 U.S. at 225, 96 S.Ct. at 2538 (deprivation of liberty); *Wolff*, 418 U.S. at 555–56, 94 S.Ct. at 1974–75 (deprivation of liberty). Thus, we must determine whether Caldwell had a protected property interest in the hardbound books in his possession, and whether he was deprived of those books without due process of law. *See, e.g., Loudermill*, —— U.S. at ——, 105 S.Ct. at 1491–93; *Logan*, 455 U.S. at 428, 102 S.Ct. at 1154; *Morrissey*, 408 U.S. at 481, 92 S.Ct. at 2600; *Toney-El*, 777 F.2d at 1226; *Turnquist v. Elliott*, 706 F.2d 809 (7th Cir.1983). It is beyond dispute that Caldwell had a property interest in his hardbound books. *See, e.g., Kimbrough v. O'Neil*, 545 F.2d 1059 (7th Cir. 1976). Hence, the only question remaining for our consideration is whether he was deprived of his books without due process of law.

■ Caldwell argues, in part, that his right to due process was violated because he was afforded notice only five minutes in advance of the confiscation of his books. As a general matter, it is true that "[a]n essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Loudermill*, —— U.S. at ——, 105 S.Ct. at 1493 (quoting *Mullane v. Central Hanover & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950)). It is also beyond cavil that the rights of an inmate "may be diminished by the needs and exigencies of the institutional environment." *Wolff*, 418 U.S. at 555, 94 S.Ct. at 2974; *see also Bell v. Wolfish*, 441 U.S. at 520, 99 S.Ct. at 1861. This is especially

---

**24.** In *Daniels v. Williams*, —— U.S. ——, ——, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986), the Court reconsidered its holding in *Parratt* and concluded that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty or property."

true where the quick and unannounced action of prison officials is necessary to the implementation of reasonable measures designed to guarantee the safety of the inmates themselves and of corrections personnel.

Prison officials are legitimately concerned that hardbound books can be used to secret weapons and other contraband. *See e.g., Bell v. Wolfish*, 441 U.S. at 558–60, 99 S.Ct. at 1884–85. At the time Caldwell's books were taken, officials had declared a state of emergency at Marion, and quite reasonably perceived a need to shakedown inmate cells. The confiscation of hardbound books was an integral part of such a measure. To have provided inmates with any more advance notice than they in fact received would have defeated the purpose of the shakedown. We, therefore, hold that Caldwell was not entitled to a pre-deprivation hearing, or to notice more in advance of the confiscation of his property than that he received.

■■■ We must consider whether Caldwell was afforded due process of law following the confiscation of his books. As we noted above, the due process rights of prisoners are not absolute, but must be accommodated to the legitimate security needs of a corrections institution. *See, e.g., Bell v. Wolfish*, 441 U.S. at 554, 99 S.Ct. at 1882; *Wolff*, 418 U.S. at 555–57, 94 S.Ct. at 2974–75. Hence, to the extent that prison officials further their interest in security and order in a reasonable and non-arbitrary manner, property claims of inmates must give way. *See, e.g., Harris v. Forsyth*, 735 F.2d 1235 (11th Cir.1984) (state statutory restrictions on contraband requiring forfeiture of money found in inmate's possession to prison welfare fund not violative of due process).

Nonetheless, prisoners are entitled to be free from arbitrary actions of prison officials that affect their constitutionally protected interests. *Hanrahan v. Lane*, 747 F.2d 1137 (7th Cir.1984); *see also Wolff*, 418 U.S. at 558, 94 S.Ct. at 2975. Even in the prison context, a restriction is not reasonably related to a legitimate goal if it is

arbitrary or purposeless. *Bell v. Wolfish*, 441 U.S. at 539, 99 S.Ct. at 1874; *St. Claire v. Cuyler*, 634 F.2d 109, 116 (3rd Cir.1980). The affidavit supporting Miller's motion for summary judgment sheds no light on the question of whether limiting Caldwell to the three choices in disposing of his confiscated property was related to a legitimate security interest. We do not doubt that prison officials were well within constitutionally permissible bounds of choice in deciding to conduct the shakedown searches, and in confiscating hardbound volumes. It is yet another question whether, once the books were removed from his cell, the refusal to allow Caldwell to send his books to friends outside Marion is reasonably related to a legitimate security consideration under the circumstances, or was unfounded and arbitrary. That is, we cannot say on the record before us whether the actions of Marion officials rested upon considerations of how best to administrate a corrections facility.

We need not, however, answer that question, because the confiscation of Caldwell's books was not effected in accord with federal prison regulations. Bureau regulations set forth the procedure to be followed by prison officials when confiscating contraband. 28 C.F.R. §§ 553.10–.15 (1985). Under these regulations, "contraband" is defined to include "any item ... which previously has been authorized for possession by an inmate ... [and] [a]ltered personal property ... when it is determined to adversely affect institution security, safety, or good order." 28 C.F.R. § 553.12. The regulations provide further that any items of personal property confiscated as contraband are to be inventoried and stored pending identification by the owner. Thereafter, "staff shall mail such items ... at the inmate's expense, to a destination of the inmate's choice." 28 C.F.R. § 553.13 (emphasis added). Prison officials failed to follow established procedure when they did not offer Caldwell the alternative of sending his books to friends outside Marion.

■■■ An agency must conform its actions to the procedures that it has adopted.

*See Pearce v. Director, Office of Workers' Compensation,* 647 F.2d 716 (7th Cir.1981); *VanderMolen v. Stetson,* 571 F.2d 617, 624 (D.C.Cir.1977); *see also Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."); *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Services v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). An inmate, too, has the right to expect prison officials to follow its policies and regulations. *Anderson v. Smith,* 697 F.2d 239 (8th Cir.1983). Here the procedures placed substantive limits on the discretion of prison authorities to dispose of an inmate's confiscated personal property. Hence, the grant of summary judgment was improper, and we reverse and remand for further consideration.

### III

For the reasons stated above, we AFFIRM the grant of summary judgment as to Caldwell's Eighth Amendment and procedural due process claims, but REVERSE and REMAND, for proceedings consistent with this opinion, Caldwell's free-exercise, access to the courts, and confiscation claims.

### APPENDIX

### Description of Basic Law Library Collection

(Provided in Affidavit of Randy J. Davis)

1. *Reporter:* "Decisions of the United States Supreme Court" (summaries of decisions)—All volumes.

2. *Statutes:*

(a) United States Code Annotated.

 (1) Title 5, Sections 1–5100 (includes Freedom of Information and Privacy Acts).

 (2) Title 18—Complete (Criminal Code and Criminal Procedures).

 (3) Title 21—Complete (Food and Drugs).

 (4) Title 26, Sections 4001 to End (Narcotic Offenses).

 (5) Title 28—Volumes containing Rules of the Supreme Court of the United States; United States Court of Appeals Rules and Federal Rules of Appellate Procedure.

 (6) Title 28, Sections 2241 to End (Habeas Corpus and Motions to Vacate Sentence).

 (7) Title 42, Sections 1891–2010 (Public Health and Welfare).

 (8) U.S. Constitution and Amendments (Complete).

(b) Federal Rules of Civil Procedure (Pamphlet).

3. *Regulations:* Title 28, Code of Federal Regulations; Judicial Administration.

4. *Program Statements*—Current Bureau of Prisons Program Statements which contain certain rules codified in Title 28, Code of Federal Regulations.

5. *Other Materials:*

(a) Black's Law Dictionary.

(b) Complete Manual of Criminal Forms, Bailey and Rothblatt.

(c) Criminal Law Reporter, current subscription.

(d) Modern Criminal Procedure, Hall and Kamisar.

(e) Constitutional Rights of Prisoners, Palmer.

(f) Federal Habeas Corpus, Sokol.

(g) You and the Law, Reader's Digest.

(h) Legal Research in a Nutshell, Cohen.

(i) Legal Research, Writing and Analysis, West Publishing Company.

(j) Corrections and Prisoners' Rights, Krantz.

(k) Manual for Prison Law Libraries, Werner.

(*l*) Modern Federal Practice Digest, Volumes 16–18A, 26, 26A, 39, and 42.

(m) Manual for Courts Martial, U.S. Government Printing Office.

(n) Justice and the Military, Public Law Education Institute (out of print—keep current copies).

(o) Rights of the Imprisoned, Singer.

(p) Practice Manual on Military Discharge Upgrading, American Civil Liberties Union.

(q) Prisoners' Assistance Directory, The National Prison Project.

(r) Criminal Procedure in a Nutshell, Israel and LaFave.