**Carl Demetrius MITCHELL, Plaintiff–Appellant,**

v.

**Gary D. MAYNARD, Director of Department of Corrections; Tom Lovelace, Inspector General, Department of Corrections; Delores Ramsey; James Saffle, Warden, State Prison, McAlester, Oklahoma; James Sorbles; Ted Willman, Warden, Mack Alford Correctional Center; Michael Crabtree, a/k/a Michale Crabtree; Sam Key, Security Major at Mack Alford Correctional Center; Michael Taylor; Louis Layton, Correctional Officer; J. Mike Pruitt, Unit Manager, Oklahoma State Penitentiary; Billy**

---

Key, Law Library Supervisor, Oklahoma State Penitentiary; George Dugan, Correctional Counselor, Oklahoma State Penitentiary; Larry Watson, CO I, Oklahoma State Penitentiary, Defendants–Appellees.

No. 94–7108.

United States Court of Appeals, Tenth Circuit.

April 1, 1996.

Jerry L. Colclazier (Amy Rose Colclazier, with him on the briefs) of Colclazier & Associates, P.C., Seminole, Oklahoma, for Plaintiff–Appellant.

Warren C. Sutter (W.A. Drew Edmondson, Attorney General, with him on the brief), Assistant Attorney General, Oklahoma City, Oklahoma, for Defendants–Appellees.

Before BALDOCK, BRORBY and KELLY, Circuit Judges.

BRORBY, Circuit Judge.

Carl Demetrius Mitchell brought suit against fourteen prison officials and employees for violations of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983.[1] The district court initially dismissed his complaint as frivolous. Following an appeal, we reversed the district court's ruling and remanded the case for trial. *Mitchell v. Maynard*, No. 92–7066, 1992 WL 401593 (10th Cir. Dec. 23, 1992). On remand, a jury trial was held on Mr. Mitchell's claims, but prior to jury deliberation, the district court granted the appellees judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a) and dismissed all Mr. Mitchell's claims. Mr. Mitchell appeals this ruling. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and reverse in part, affirm in part and remand for proceedings consistent with this opinion.

Mr. Mitchell raises eight issues on appeal: 1) were his Eighth Amendment rights violated by the conditions of his confinement at Oklahoma State Penitentiary, deliberate indifference to his medical needs, and subjecting him to excessive force; 2) was there "some" evidence to support the conviction of the prison disciplinary offense, such that due process requirements are satisfied; 3) was he denied due process when the appellees failed to follow the time deadlines and conditions of confinement as set forth in the Department of Corrections' policies and regulations; 4) did the trial court err by refusing to remove Mr. Mitchell's shackles and leg irons at trial; 5) should each of the appellees be held liable for their respective participation in violating Mr. Mitchell's rights; 6) did the district court err in preventing testimony at trial on Mr. Mitchell's claims of retaliation for exercise of a protected right; 7) is Mr. Mitchell entitled to judgment as a matter of law that his constitutional rights were violated, such that the only need for a new trial would be on the issue of damages; and 8) based upon the trial judge's rulings, and his performance at trial, if a new trial is ordered by this Court, is Mr. Mitchell entitled to a change of trial judge?

We review de novo the grant or denial of a motion for judgment as a matter of law under Fed.R.Civ.P. 50. *Sheets v. Salt Lake County*, 45 F.3d 1383, 1387 (10th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 74, 133 L.Ed.2d 34 (1995). It is appropriate for a trial court to enter judgment as a matter of law "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). When reviewing a grant or denial of a judgment as a matter of law " 'we must construe the evidence and inferences most favorably to the nonmoving party.' " *FDIC v. United Pac. Ins. Co.,* 20 F.3d 1070, 1079 (10th Cir.1994) (quoting *Ralston Dev. Corp. v. United States,* 937 F.2d 510, 512 (10th Cir.1991)).

A detailed factual background, drawing all reasonable inferences in favor of Mr. Mitchell, is necessary to truly understand the nature of this case. Mr. Mitchell initially was incarcerated at the Mack Alford Correctional Center in Stringtown, Oklahoma, for larceny of merchandise. Mr. Mitchell spent a great

---

1. Title 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the district of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

deal of time in the facility's law library where he conducted legal research and assisted other inmates with their legal problems. He claims that as his legal acumen grew so did the animosity of prison officials toward him. Warden James Saffle agreed Mr. Mitchell was a "model, non-troublemaking prisoner."

On May 13, 1988, a riot occurred at the prison. As the riot escalated, the instigators barricaded themselves in the South Building, where Mr. Mitchell was housed. The riot lasted three full days and nights. Several hostages were taken and much of the facility was razed. Mr. Mitchell says he was asleep when the riot began and that he had nothing to do with what took place. In fact, Mr. Mitchell, an African American, after the urging of two guards, attempted to negotiate the release of the hostages by approaching the two White Supremacists who claimed total responsibility for the riot. When the riot ended, the South Building still contained nearly 100 inmates, approximately forty-one of whom, including Mr. Mitchell, were then transported to the Oklahoma State Penitentiary at McAlester.

Once he arrived at McAlester, Mr. Mitchell was separated from the other inmates, stripped of all his clothing and his prescription eyeglasses, and placed in wrist, ankle and belly chains. To transport him to his cell, two guards picked him up by his elbows with nightsticks and forced him to run across the gravel yard. During this run, he fell to the ground, at which point the guards began kicking and stomping him while yelling "get up, nigger, get up." This incident caused him several injuries including cuts and bruises and a swollen hand with two immovable fingers.

His cell, located in the G-unit, had been stripped of its mattress and bedding. Mr. Mitchell was left naked in the empty 5' × 8' concrete cell. Outside nighttime temperatures were in the 50's and the G-unit had no heating. Mr. Saffle had authorized the cells to be stripped, claiming that clothing and bedding were privileges. Mr. Saffle also testified clothing could be wrapped around light bulbs to start fires and used to snare and choke the guards. Mr. Saffle further stated the mattresses could be used to barricade the doors thus allowing the prisoners to "ambush" the guards and the mattress covers could be used to obstruct the plumbing and flood the cells. Mr. Mitchell and the other inmates of the G-unit were forced to take cold showers because there was no water heater. Mr. Saffle claims a lack of funding to accommodate the influx of 435 inmates from the Stringfield facility prevented him from purchasing the $100 water heater. Mr. Mitchell also was not allowed out of his cell for nearly four weeks for exercise or any other purpose. In fact, he was only allowed outside his cell on two occasions during a five-month period. His eyeglasses were not returned to him for two months, during which time he suffered severe headaches due to his visual condition of presbyopia and the poor lighting in his cell. Mr. Mitchell also testified the ventilation within G-unit was inadequate. "You could look up and there was garbage in the ventilation deal. There was dirt and grass growing in it—and the air that did happen to pass through that was musty and it was nasty, and it took your breath at times." Furthermore, he was only provided toilet paper by the guards one square at a time and sometimes they would taunt him or refuse his request. Mr. Saffle said the toilet paper rationing was necessary because the inmates could use it to obstruct the plumbing and flood the cells. Mr. Mitchell also was not allowed to have a pen or pencil with which to write grievances or legal complaints for at least several days. Mr. Saffle said this was because the pencils could be used as "sticking" devices. On June 9, 1988, Mr. Mitchell complained about these conditions by filing a written grievance with Mr. Saffle. Mr. Saffle denied Mr. Mitchell's grievance.

Mr. Mitchell was not formally accused with contributing to the riot until two weeks after his transfer to McAlester. Initially, Mr. Mitchell was shown a copy of an officer report which listed Karl Goodson as the only witness who would testify against him. Mr. Goodson did not mention seeing Mr. Mitchell participate in the riot. Based on this lack of evidence and Investigator Michael Taylor's assurance that the report did not accuse Mr. Mitchell of any wrongdoing, Mr. Mitchell

signed the report and waived his right to call witnesses and to have a staff representative at his disciplinary hearing. After Mr. Mitchell signed the report, a new witness, Louis Layton, was added. Mr. Mitchell was provided a copy of the report listing Mr. Layton as a witness eight days before his disciplinary hearing. In a signed report, Mr. Layton stated he had seen Mr. Mitchell throw rocks, although at trial he testified he only saw Mr. Mitchell throw one rock, at firefighters and guards during the riot. The statement did not give a time or place of the alleged sighting. Mr. Layton also testified at trial that at the time of the riot he did not know who Mr. Mitchell was and conceded that the official statement he originally prepared for the disciplinary proceedings identifying the prisoners who participated in the riot did not inculpate Mr. Mitchell. At trial, however, Mr. Layton produced an unofficial copy of this statement that implicated Mr. Mitchell. As further support, Mr. Layton produced an affidavit in which he stated he saw Mr. Mitchell throwing rocks at Stringtown on May 17, 1988—an impossibility because by that time Mr. Mitchell had already been transported to McAlester.

Michael Crabtree presided over Mr. Mitchell's disciplinary hearing. Mr. Mitchell challenged Mr. Crabtree's impartiality because he had observed many of the offenses committed during the riot, his office was located in the building where the riot had started, his desk was charred by a fire during the riot, and his stereo was damaged. Mr. Crabtree had also chaired the committee responsible for placing inmates at other prison facilities and in particular he had been responsible for changing Mr. Mitchell's placement from medium security to maximum security. Based on Mr. Layton's testimony, Mr. Crabtree found Mr. Mitchell guilty of participating in the riot. Delores Ramsay was responsible for reviewing misconduct convictions appealed to the Director of the Department of Corrections. At trial, Ms. Ramsay testified that she affirmed Mr. Mitchell's misconduct conviction after conducting an investigation outside of the record because the record before her was insufficient on its own to affirm his conviction.

## I

We now turn to Mr. Mitchell's claim the district court erred in granting appellees judgment as matter of law on his Eighth Amendment claims. The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Eighth Amendment applies to the states through the Fourteenth Amendment. *See Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Mr. Mitchell points to three ways defendants violated his Eighth Amendment Rights: 1) the beating by the guards; 2) the conditions of confinement at G-unit; and 3) the defendants' deliberate indifference to his medical needs. We will address each allegation in turn.

In order for the beating by the guards to rise to the level of an Eighth Amendment violation, Mr. Mitchell must show the guards acted maliciously and sadistically for the very purpose of causing harm rather than in a good-faith effort to maintain or restore discipline. *Hudson v. McMillian*, 503 U.S. 1, 6–7, 112 S.Ct. 995, 998–99, 117 L.Ed.2d 156 (1992). In making this determination, it is necessary for us to balance the need for application of force with the amount of force used. *Id.* at 7, 112 S.Ct. at 999. This standard "applies regardless of whether the corrections officers are quelling a prison disturbance or merely trying to maintain order." *Northington v. Jackson*, 973 F.2d 1518, 1523 (10th Cir.1992). It is not necessary for the plaintiff to allege a significant physical injury to state a cause of action. *Id.* The facts, viewed in the light most favorable to Mr. Mitchell, show that after he tripped and fell to the ground, he was beaten by several guards with night sticks while they shouted racial epithets at him. Mr. Mitchell, who was naked and shackled at the wrists, ankles and belly, was particularly vulnerable at the time the attack occurred. As a result of the beating, Mr. Mitchell suffered cuts, bruises and a swollen hand—with possibly broken fingers. Even if we find the arrival

of the Stringtown inmates at McAlester in the wake of the riot constituted an emergency situation, there is no indication Mr. Mitchell had acted inappropriately or posed any type of a disciplinary problem or threat prior to or at the time of the beating. A reasonable jury could conclude that the guards' behavior falls into the category of malicious and sadistic rather than a good faith effort to maintain or restore discipline. This conclusion is supported by Mr. Mitchell's vulnerability at the time of the attack, the lack of provocation on his part and the guards' use of racial epithets during the beating.

▮ Rather than disputing the brutality of the beating, the appellees claim Mr. Mitchell must lose on this issue because he failed to name the guards responsible for the above activity in his complaint. Fed.R.Civ.P. 10(a) requires that "in the complaint the title of the action shall include the names of all the parties." It has been held a party not properly named in the caption of a complaint may still be properly before the court if the allegations in the body of the complaint make it plain the party is intended as a defendant; merely naming a party in a brief, however, does not provide adequate notice. *See Rice v. Hamilton Air Force Base Commissary,* 720 F.2d 1082, 1085 (9th Cir.1983). In his brief, Mr. Mitchell claims "Defendants Mason and Franklin were identified during discovery pursuant to this Court's ruling in Mitchell I." Mr. Mitchell then references his trial brief, which he did not include as part of the record on appeal, as support for this identification. As we just stated, even if his brief did mention the two guards, mere mention in a brief is not adequate grounds on which to hold parties liable. The docket statement indicates Mr. Mitchell was granted leave to amend his complaint to add two parties, but there is no evidence he did so. We are unable to enter a judgment against parties who are not listed in the complaint, were not served notice of the lawsuit and are not properly before the court.

▮ Furthermore, Mr. Mitchell does not include any evidence to link the named appellees to the guards' actions. Although he does name the Warden and the Director of the Correctional facilities as defendants, su-

pervisor status by itself is insufficient to support liability. *Rizzo v. Goode,* 423 U.S. 362, 376, 96 S.Ct. 598, 606–07, 46 L.Ed.2d 561 (1976). Rather, "[p]ersonal participation is an essential allegation in a § 1983 claim." *Bennett v. Passic,* 545 F.2d 1260, 1262–63 (10th Cir.1976); *see Ruark v. Solano,* 928 F.2d 947, 950 (10th Cir.1991) (no respondeat superior liability under § 1983). Because Mr. Mitchell failed to sue the parties responsible for the beating and does not allege any personal involvement of the parties before the court, we affirm the district court's dismissal of Mr. Mitchell's claims for failure to state a cause of action that the beating violated his Eighth Amendment Rights.

▮ We now address Mr. Mitchell's claim that the conditions of the G-unit, or "the rock", violated his Eighth Amendment Rights. This claim is asserted against Gary Maynard, director of the Oklahoma Department of Corrections, and Mr. Saffle, warden at McAlester. The Supreme Court first addressed the limitations the Eighth Amendment "imposes upon the conditions in which a State may confine those convicted of crimes" in *Rhodes v. Chapman,* 452 U.S. 337, 345, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981). In *Rhodes,* the court noted that no "static test" can be used by the courts to determine what types of conditions violate the Eighth Amendment, but instead the courts " 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' " *Id.* at 346, 101 S.Ct. at 2399 (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). The court then emphasized the importance of using objective factors in making a determination as to whether prison conditions were cruel and unusual and thus unconstitutional or "restrictive and even harsh" and thus merely a "part of the penalty that criminal offenders pay for their offenses against society." *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399. Justice Powell, writing for the majority, held that in order for a condition of confinement to be considered cruel and unusual it must be either: (a) "grossly disproportionate to the severity of the crime" warranting punishment, (b) involve the "the wanton and unnec-

essary infliction of pain" or (c) deprive "inmates of the minimal civilized measure of life's necessities." *Id.* at 347, 101 S.Ct. at 2399. It is important to consider the conditions of confinement as a whole because several deprivations "in combination" may constitute a constitutional violation "when they have a mutually enforcing effect that produces. the deprivation of a single, identifiable human need, such as food, warmth, or exercise—for example a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter,* 501 U.S. 294, 304, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991). Overall, "[t]he [Eighth] Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity and decency.'" *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (quoting *Jackson v. Bishop,* 404 F.2d 571, 579 (8th Cir.1968)).

▇▇ In *Wilson,* the Supreme Court adopted the deliberate indifference standard for Eighth Amendment claims involving conditions of confinement. Under this standard "courts considering a prisoner's claim must ask both if the officials act[ed] with a sufficiently culpable state of mind and if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999 (internal quotations and citation omitted). In the Tenth Circuit "an official or municipality acts with deliberate indifference if its conduct (or adopted policy) disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights." *Berry v. City of Muskogee,* 900 F.2d 1489, 1496 (10th Cir.1990). Deliberate indifference does not require a finding of express intent to harm. *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). Recently the Supreme Court held deliberate indifference requires that the prison official knew of and disregarded "an excessive risk to inmate health or safety." *Farmer v. Brennan,* —— U.S. ——, ——, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994).

The facts, construed in Mr. Mitchell's favor, indicate Mr. Mitchell was stripped of his clothing, placed in a concrete cell, with no heat at a time when nighttime temperatures hovered in the mid-fifties, provided no mattress, blankets or bedding of any kind, deprived of his prescription eyeglasses, not allowed to leave his cell for exercise, not provided with writing utensils, not provided with adequate ventilation, not provided with hot water, and only sometimes allowed minimal amounts of toilet paper. These conditions supposedly lasted for a period of days, weeks and months depending on the condition and whether Mr. Mitchell's or Mr. Saffle's testimony is believed. The combination of these factors is a significant departure from the "healthy habilitative environment" the state is required to provide its inmates. *Ramos v. Lamm,* 639 F.2d 559, 568 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). In *Ramos,* we recognized "a state must provide [an inmate with] reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities (*i.e.,* hot and cold water, light, heat, plumbing)." *Id.* Mr. Mitchell allegedly was denied many of the basic necessities listed above by Mr. Saffle's express order. A reasonable jury could have concluded Mr. Maynard had knowledge of the conditions and condoned them when he upheld Mr. Saffle's denial of Mr. Mitchell's grievance regarding the conditions of the G-unit.

Appellees use the testimony of Mr. Saffle to assert these deprivations were necessary to confront the emergency influx of 435 inmates. Appellees stress Mr. Mitchell was part of a group of inmates who had been credited with creating a riot that nearly destroyed another prison. Mr. Saffle testified that in light of the above situation, he ordered several items to be withheld. Mr. Saffle justified these deprivations by stating:

> To safeguard and be proactive with my particular unit and my staff and in order to best serve the public, I made the decision to deprive them of certain things until they showed me that they were going to act like men and not become disruptive and tear up another unit and cause my staff problems. I continued to give them privileges and continued to improve the conditions out there based on their behavior.

The defendants point to the deference afforded the opinions of prison administrators regarding how to maintain internal security. We agree that the opinions of prison administrators carry great weight; however, their discretion is not absolute. *Whitley*, 475 U.S. at 321–22, 106 S.Ct. at 1085–86. This deference "does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." *Whitley*, 475 U.S. at 322, 106 S.Ct. at 1085. In reviewing prison administrators' decisions, we must refrain from usurping the role of prison administrators while protecting the constitutional rights of the inmates. *See Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) ( "a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims").

In a case such as this, where the alleged deprivations are numerous and inhumane, we cannot blindly acquiesce to Mr. Saffle's authority. Several of the specific conditions Mr. Mitchell allegedly endured have been expressly held to state claims under the Eighth Amendment prohibition against cruel and unusual punishments. In particular we are troubled by the lack of heat combined with the lack of clothing and bedding, the deprivation of exercise for an extensive period of time, the lack of hot water, the denial of toilet paper, the removal of his prescription eyeglasses, the lack of adequate ventilation and the denial of writing utensils. In *Gregory v. Wyse*, 512 F.2d 378, 381 (10th Cir.1975), we agreed it was cruel and unusual punishment to keep an inmate naked for twelve days in a cell that had been stripped of its bedding, did not have adequate heating, ventilation, lighting or furnishing and was seldom cleaned. Mr. Mitchell has alleged he suffered several of the above deprivations and others for much longer than twelve days. *See also Caldwell v. Miller*, 790 F.2d 589, 600 (7th Cir.1986) (prolonged restriction of exercise that threatens an inmate's physical health might violate the Eighth Amendment); *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir.1985) (allegations of unsanitary physical conditions, denial of personal hygiene and lack of opportunity to exercise state valid claims under the Eighth Amendment); *Hoptowit v. Spellman*, 753 F.2d 779, 783–84 (9th Cir.1985) (poor lighting can support finding of Eighth Amendment violation); *Ramos*, 639 F.2d at 568 (state must provide bedding, heat, hot water and hygienic materials); *Benter v. Peck*, 825 F.Supp. 1411, 1419 (S.D.Iowa 1993) (denial of prescription eyeglasses can violate the Eighth Amendment when the eyeglasses represent a serious medical need).

Although there is conflicting testimony between Mr. Mitchell and Mr. Saffle regarding when some of the items began to be granted, the time frame ranged from twenty-four hours to five and one half months. When conflicting testimony is presented regarding events and motivations, "it is the jury's prerogative to weigh the credibility of the witnesses and determine who should be believed." *Klein v. Grynberg*, 44 F.3d 1497, 1504 (10th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 58, 133 L.Ed.2d 22 (1995); *see also United States v. Hager*, 969 F.2d 883, 888 (10th Cir.), *cert. denied*, 506 U.S. 964, 113 S.Ct. 437, 121 L.Ed.2d 357 (1992) ("The credibility of a witness and weight of his testimony are for the trier of fact alone."). Once the jury decided whom to believe, it could then decide whether these alleged deprivations constituted cruel and unusual punishment. In light of Mr. Mitchell's allegations and evidence the trial court should not have granted the defendants' motion for judgment as a matter of law. Mr. Mitchell alleged conditions that could constitute a violation of his right to be free of cruel and unusual punishments, and it was for the jury to determine the extent of the deprivations and the credibility of the warden and his intentions. We reverse the district court's ruling that as a matter of law the plaintiff failed to state an Eighth Amendment claim regarding the conditions of his confinement. We will not, however, as Mr. Mitchell urges, find for him as a matter of law on his constitutional claims and remand only for the calculation of damages. Rather, we remand for a new trial on the issue because we believe there are factual issues

regarding the conditions of confinement that should be resolved by a jury.

■ Finally, we will address Mr. Mitchell's Eighth Amendment claim regarding his medical needs. Mr. Mitchell claims he was not provided adequate medical attention despite a severe illness the first night he was placed in the G-unit. The evidence indicates Mr. Mitchell was cold and shivering as a result of the loss of body heat, and had sweat and mucus running out of his mouth as well as several broken fingers. He also was denied the use of his prescription eyeglasses. The Supreme Court has held that failure to provide medical attention can violate the Eighth Amendment for "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle*, 429 U.S. at 103, 97 S.Ct. at 290. In *Estelle*, the Court concluded that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment." *Id.* at 104, 97 S.Ct. at 291 (internal quotations and citations omitted). In *Miller v. Glanz*, 948 F.2d 1562 (10th Cir.1991), we noted the Supreme Court's clarified deliberate indifference standard has two components: "an objective component requiring that the pain or deprivation be sufficiently serious; and a subjective component requiring that the offending officials act with a sufficiently culpable state of mind." *Id.* at 1569 (citing *Wilson*, 501 U.S. at 298, 111 S.Ct. at 2323–24). In *Wilson*, the Supreme Court held that "allegations of 'inadvertent failure to provide adequate medical care' or of a 'negligent ... diagnos[is]' simply fail to establish the requisite culpable state of mind." *Wilson*, 501 U.S. at 297, 111 S.Ct. at 2323 (citations omitted).

■ Mr. Mitchell fails to allege any deliberate indifference. He produces no evidence showing any knowledge on the part of the named appellees of his condition or that he requested and was denied medical care for his injuries the first night. Nevertheless, a guard noticing his condition the second night called a nurse who provided Mr. Mitchell with treatment. Mr. Mitchell does not contend that he needed additional treatment or that he was denied access to medical treatment. At trial Mr. Mitchell testified that he did not request medical help or file a slip requesting care because "[o]nce I seen that I wasn't going to be attended to, period, I just left it alone. I just quit—I seen that I wasn't fixing to die, you know, so I seen that I would probably heal, and I just left them alone." This admission undermines the seriousness of his condition. If he did not believe his condition serious enough to warrant medical treatment, how can he hold the prison officials liable for failing to find his condition serious enough to warrant treatment? His failure to alert prison officials to his condition, absent any showing of knowledge on their part renders their failure to attend to his needs at best an inadvertent failure to address his medical condition. Regarding the removal of his eyeglasses, again he does not allege any evidence to show deliberate indifference resulting in substantial harm. Mr. Saffle stated several reasons why eyeglasses would be removed from inmates. Most importantly, the evidence establishes that after Mr. Mitchell complained to prison officials he was having trouble with his eyes, he was examined by an optometrist and provided with a new pair of eyeglasses. Finally, Mr. Mitchell fails to allege any personal involvement of any of the named defendants in the above deprivations. As noted above, personal involvement is an essential allegation in a § 1983 action. *Bennett*, 545 F.2d at 1262–63. For these reasons we affirm the district court's ruling regarding Mr. Mitchell's medical neglect claims.

## II

■ Mr. Mitchell claims the disciplinary hearing, in which he was found guilty of participating in the riot, violated his Fourteenth Amendment right to due process. After the hearing, the disciplinary committee revoked his good time credits and placed him in restrictive confinement. It is well settled "that an inmate's liberty interest in his earned good time credits cannot be denied 'without the minimal safeguards afforded by the Due Process Clause of the Fourteenth Amendment.'" *Taylor v. Wallace*, 931 F.2d 698, 700 (10th Cir.1991) (quoting *Ponte v.*

*Real,* 471 U.S. 491, 495, 105 S.Ct. 2192, 2195, 85 L.Ed.2d 553 (1985)). The Supreme Court has held, however, that "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). To meet the standards of due process in a disciplinary proceeding under *Wolff,*

> the inmate must receive: (1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action.

*Superintendent, Mass. Correctional Inst. v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985). If there is some evidence to support the disciplinary committee's decision to revoke good time credits, then the requirements of procedural due process have been met. *Id.* "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses or weighing of the evidence. Instead, the relevant conclusion is whether there is any evidence that could support the conclusion reached by the disciplinary board." *Id.* at 455–56, 105 S.Ct. at 2774. The decision can be upheld even if the evidence supporting the decision is "meager". *Id.* at 457, 105 S.Ct. at 2775.

▮ Mr. Mitchell alleges many ways his due process rights were violated, including the reliability of the statement relied on to discipline him and the adequacy of the written findings. Our review, however, is limited to whether the three steps mandated by *Wolff* were followed and whether there was some evidence to support the disciplinary committee's findings. Mr. Mitchell does not dispute that he was given advance written notice of the disciplinary charges. In fact, at least eight days prior to his hearing he was given a written copy of the charges indicating he had participated in the riot and listing the names of two guards who would produce

evidence against him. He also does not dispute he was provided a hearing. He does claim, however, that he was not able to call witnesses and present documentary evidence because he was not provided with the exact time and place of the conduct he was charged with committing. He signed a form, however, waiving his right to call witnesses and to be aided by a staff representative and did not raise this problem during the hearing. Finally, Mr. Mitchell challenges the written statement by the fact finder. The committee's written report stated Mr. Mitchell was found guilty based on an officer's report "related to this officer". Although in this case the report was not confidential, we have found that a written report stating the committee found the inmate guilty "in reliance upon confidential witness statements" to be sufficient where the offense report explicitly described his conduct and the basis of his punishment was participating in a riot. *Taylor,* 931 F.2d at 703. The purposes of the written finding is "to insure adequate review of the proceedings, to protect the inmate against collateral consequences, and to guarantee that officials, faced with outside scrutiny, will act fairly." *Smith v. Maschner,* 899 F.2d 940, 946 (10th Cir.1990). In the case at bar, Mr. Mitchell had adequate notice of the conduct he was accused of committing and whose statement had incriminated him. The lack of more specific findings also did not hamper our ability to review the proceeding and its findings. There was some evidence supporting the committee's finding, and it is not our job to address the validity of that evidence. We therefore affirm the district court's grant of a directed verdict on Mr. Mitchell's due process challenge to the administrative hearing.

### III

▮ Mr. Mitchell next claims his due process rights were violated because defendants failed to follow their own established procedures. He claims inmates have a right to expect prison officials to follow their own policies and regulations. *See Caldwell v. Miller,* 790 F.2d 589, 610 (7th Cir.1986); *Anderson v. Smith,* 697 F.2d 239 (8th Cir. 1983). In particular, Mr. Mitchell challenges

Mr. Crabtree's role as the decision maker in his disciplinary hearing. The Oklahoma Department of Corrections "Offender Management and Services Manual" provides:

> Staff persons with direct involvement in a disciplinary case shall be prohibited from serving as disciplinary officer, investigator, or staff representative. Neither serving the offense report nor awareness of the offense constitutes direct involvement. The following activities constitute involvement in the disciplinary process:
>
> Witnessed the offense or prepared the offense report.
>
> Involved in the events leading to and immediately following the offense.
>
> Engaged in any activity which may compromise the ability to function objectively, e.g., family relationship between staff member writing offense report and investigator.

Mr. Mitchell challenges Mr. Crabtree's impartiality because Mr. Crabtree allegedly witnessed the riot, had some personal property destroyed during it and had chaired a committee which reassigned Mr. Mitchell's security status from medium security to maximum security. Our concern with this issue is whether Mr. Crabtree's involvement prevented Mr. Mitchell from a meaningful opportunity to be heard. For a fundamental requirement of due process is the opportunity to be heard. *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). "When a prisoner asserts a valid challenge to the factfinders' neutrality, therefore, judicial review of disciplinary decisions must include an inquiry into whether discipline was imposed for an improper purpose." *Smith,* 899 F.2d at 947. The evidence Mr. Mitchell relies on fails to violate the Department of Corrections policy or to prove an improper motive for Mr. Crabtree's decision. Although Mr. Crabtree may have witnessed portions of the riot from outside the prison, Mr. Mitchell does not allege that Mr. Crabtree witnessed his participation in the riot or had any prior dealings with him. Because Mr. Crabtree was outside the prison when the riot occurred he was not involved in the events leading up to it and immediately following it. Mr. Crabtree did not prepare the offense report, nor was he related to someone who did. Having Mr. Crabtree preside over Mr. Mitchell's disciplinary proceeding neither violated the Department of Corrections' policies nor prevented Mr. Mitchell from a meaningful opportunity to be heard.

Mr. Mitchell also challenges the actions of Delores Ramsey who reviewed his appeal of the result of his disciplinary proceeding. Because we found the determination to be based on some evidence and thus valid, we need not address the validity of the prison's internal appellate procedure.

Mr. Mitchell next claims defendants failed to follow their own policies by confining him in the conditions addressed under his Eighth Amendment claims. His argument merely repeats the deprivations he underwent while confined in the G-unit. We believe these conditions are better dealt with under the Eighth Amendment; therefore we will not address them here.

## IV

 Next, Mr. Mitchell challenges the district court's refusal to remove his shackles and leg irons at trial. The district court denied Mr. Mitchell's request to have an evidentiary hearing to determine whether he should remain shackled during the trial. Whether to shackle a defendant during a trial is within the sound discretion of the district court. *United States v. Hack,* 782 F.2d 862, 867 (10th Cir.) ("the decision to impose appropriate means in restraining, even to the point of shackling, a defendant lies within the informed discretion of the trial court and will not be disturbed on appeal unless that discretion was clearly abused"), *cert. denied,* 476 U.S. 1184, 106 S.Ct. 2921, 91 L.Ed.2d 549 (1986); *Snow v. Oklahoma,* 489 F.2d 278, 280 (10th Cir.1973) ("[t]he type and necessity of precautionary measures taken during the course of trial is within the sound discretion of the trial court"). In deciding whether to shackle a prisoner during a jury trial the district court must balance the need to protect the jury, court officers and witnesses with any prejudice the shackles could arouse in the jurors' minds. *See Lemons v. Skidmore,* 985 F.2d 354, 357–58 (7th Cir. 1993) (holding that prejudice caused by hav-

ing plaintiff appear in handcuffs and leg irons can be overridden by "extreme need"). We agree with appellees that because this case was dismissed on a motion for judgment as a matter of law, any claim made by Mr. Mitchell based on prejudice the shackles may have instilled in the jury is moot because the jury did not decide Mr. Mitchell's claims. In other words, the district court's decision could not have resulted in any prejudice to Mr. Mitchell.

### V

Mr. Mitchell next claims each of the defendants should be held liable for their respective participation in the denial of his constitutional rights. We assume from his argument's focus he is challenging the appellees' ability to raise the defense of qualified immunity. We were not provided with a complete record of the trial proceedings and thus we have no way of knowing whether the appellees even properly raised the issue of qualified immunity in the trial court.

 The doctrine of qualified immunity provides that "[w]hen government officials are performing discretionary functions, they will not be held liable for their conduct unless their actions violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pueblo Neighborhood Health Centers, Inc. v. Losavio,* 847 F.2d 642, 645 (10th Cir.1988) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Although qualified immunity is an affirmative defense, its protection extends farther than ordinary affirmative defenses. Qualified immunity shields a defendant from the burdens of discovery and trial as well as liability. *Id.* But "[d]efendants must raise the qualified immunity defense in order to benefit from the substantial shield it affords." *Quezada v. County of Bernalillo,* 944 F.2d 710, 718 (10th Cir.1991). The record we have before us does not indicate whether or not the appellees raised the defense of qualified immunity in the trial court. An appellate court will not address issues not raised in the district court. *Lyons v. Jefferson Bank & Trust,* 994 F.2d 716, 722 (10th Cir.1993). Even if defendants had properly raised the defense of qualified

immunity, however, it would not shield them from Mr. Mitchell's conditions of confinement claims because the alleged conditions could be found by a jury to be a violation of a clearly established constitutional right of which a reasonable person should have known.

### VI

Mr. Mitchell next maintains the district court too narrowly interpreted the pretrial order in restricting testimonial evidence on his retaliation claims and the law of the case doctrine precluded the trial court from restricting such evidence. Rule 17(c), Local Court Rules of the United States District Court for the Eastern District of Oklahoma, provides:

> Counsel for the plaintiff will prepare a pretrial order unless otherwise ordered by the Court; said order to contain the results of the conference and advice to the Court regarding all facts and legal issues involved, including details of all evidence to be presented; and the order shall present all questions of law.... The contents of the pretrial order shall supersede the pleadings and govern the trial of the case unless departure therefrom is permitted by the Court in the interest of justice. The pretrial order shall be approved by all parties....

 In the pretrial order Mr. Mitchell stated: "Whether the defendant's conduct towards the plaintiff and the conditions of plaintiff's confinement at the Oklahoma State Penitentiary resulted in violations of plaintiff's constitutional right to freedom from cruel and unusual punishment?" The district court found the above language did not include the issue of retaliation as an improper motive for Mr. Mitchell's transfer and conditions of confinement and did not allow any evidence on this issue to be presented at trial. First, Mr. Mitchell argues the above passage includes the issue of retaliation as part of "defendant's conduct." The district court is entitled to considerable deference in its interpretation and application of its own rules of practice and procedure. *Smith v. Ford Motor Co.,* 626 F.2d 784, 796 (10th

**1448**

Cir.1980), *cert. denied,* 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981); *see also Lance, Inc. v. Dewco Servs., Inc.,* 422 F.2d 778, 784 (9th Cir.1970) (noting "Local Rules are promulgated by District Courts primarily to promote the efficiency of the Court, and that the Court has a large measure of discretion in interpreting and applying them"). To hold "defendant's conduct" to include retaliation based on Mr. Mitchell's constitutionally protected legal activities and legal assistance to other inmates would require an expansive interpretation we are unwilling to give in light of the deference owed the district court. Furthermore, Mr. Mitchell's constitutional protection of access to the courts is a due process right guaranteed by the Fourteenth Amendment and not the Eighth Amendment's cruel and unusual punishment clause which Mr. Mitchell references in the pretrial order. *Wolff,* 418 U.S. at 579, 94 S.Ct. at 2986.

■■■■■ Second, Mr. Mitchell argues that the law of the case doctrine prohibited the district court from making such a ruling. The law of the case doctrine provides that once an appellate court decides an issue the decision will be binding on all subsequent proceedings in the same case. *Rohrbaugh v. Celotex Corp.,* 53 F.3d 1181, 1183 (10th Cir. 1995). Mr. Mitchell maintains that our earlier ruling in which we reversed the district court's dismissal of his claims as frivolous is binding on the district court. In that opinion, we stated, "factual allegations of retaliation, when combined with his allegations challenging the propriety of the disciplinary proceedings, [were] sufficient to state an arguable legal and factual claim." *Mitchell v. Maynard,* No. 92–7066, 1992 WL 401593 *2 (10th Cir. Dec. 23, 1992). Mr. Mitchell's reliance on this passage is misplaced. "Law of the case principles do not bar a district court from acting unless an appellate decision has issued on the merits of the claim sought to be precluded." *Wilmer v. Board of County Comm'rs of Leavenworth County,* 69 F.3d 406, 409 (10th Cir.1995) (internal quotations and citations omitted). In *Mitchell I,* we merely stated he could state a retaliation claim; it was then up to him to do so. Our statement does not constitute a decision that he be unconditionally allowed to bring his

claim to trial, nor does it constitute a decision that he had already established a valid claim for retaliation. It was still incumbent on him to follow the proper procedures to bring his claim before the district court. Because he failed to do so, we defer to the district court and affirm its decision to bar Mr. Mitchell's claims of retaliation.

## VII

■■■■■ Finally, Mr. Mitchell requests that on remand we exercise our inherent power as the administrator of appeals and remands to reassign this case to a different district judge. Although normally the recusal of a district court judge is addressed at the trial level pursuant to 28 U.S.C. §§ 144 and 455, "[t]he appellate court's authority to reassign exists apart from the judicial disqualification statutes." *O'Rourke v. City of Norman,* 875 F.2d 1465, 1475 (10th Cir.), *cert. denied,* 493 U.S. 918, 110 S.Ct. 280, 107 L.Ed.2d 260 (1989); *Offutt v. United States,* 348 U.S. 11, 16–18, 75 S.Ct. 11, 14–16, 99 L.Ed. 11 (1954). In particular, the All Writs Act provides "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. We also derive this power from 28 U.S.C. § 2106 which provides "[t]he Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances." Respectful of the extraordinary nature of such a request, we will remand with instructions for assignment of a different judge only when there is proof of personal bias or under extreme circumstances. *O'Rourke,* 875 F.2d at 1475.

We agree with Mr. Mitchell that a fair and unbiased tribunal is a basic requirement of due process. Mr. Mitchell points to several comments and actions of the trial judge as evidence that Judge Seay harbored personal bias against him. First, Mr. Mitchell notes that originally the case was assigned to Judge Cook. Judge Cook denied appellees'

motion to dismiss Mr. Mitchell's complaint as frivolous under 28 U.S.C. § 1915(d). When Judge Cook retired, the case was transferred to Judge Seay along with several other prisoner cases. Mr. Mitchell claims that "[i]n one fell swoop, Judge Seay dismissed each and every prisoner case he had been assigned, even cases which had already been determined not frivolous by Judge Cook, such as the Plaintiff's case." We reversed the dismissal and remanded the case for trial. After the close of evidence in the jury trial, Judge Seay granted judgment as a matter of law without allowing jury deliberations. Mr. Mitchell claims the district court's actions in light of the totality of the evidence indicate judicial bias and hostility. However, we have held in the context of recusal cases that prior adverse rulings cannot in themselves create grounds for disqualification. *Green v. Dorrell,* 969 F.2d 915, 919 (10th Cir.1992), *cert. denied,* 507 U.S. 940, 113 S.Ct. 1336, 122 L.Ed.2d 720 (1993); *Glass v. Pfeffer,* 849 F.2d 1261, 1268 (10th Cir.1988).

Mr. Mitchell also cites certain comments the judge made as being indicative of his hostility. Mr. Mitchell notes that the first issue of business the judge raised was to order Mr. Mitchell and his attorney to switch counsel tables with the appellees by stating:

> Well, to begin with, I don't know what he's doing over there. You people ought to change, put the plaintiff's counsel over here. You're in the wrong place. Anybody who's a prisoner belongs over here so the guards can be close to him, and not over close to the jury. Just change right now. Now.

Mr. Mitchell then draws our attention to Judge Seay's determination not to hold an evidentiary hearing before deciding that Mr. Mitchell should remain shackled during the trial. Mr. Mitchell also references numerous places in the record where the judge objected to questions or material that defense counsel did not object to. This by itself, however, is within the judge's role of ensuring a fair trial. For "a trial judge may exclude or limit questions or testimony *sua sponte* to expedite the trial, and justice still may be done." *United States v. Mobile Materials, Inc.,* 881 F.2d 866, 877 (10th Cir.

1989), *cert. denied,* 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990). The question is whether there is other evidence to suggest that the consistent adverse rulings were an indication of judicial bias or animosity. *See id.* At one point Judge Seay interrupted Mr. Mitchell's testimony to state:

> Counsel doesn't object, but I do, as to you talking about something that happened years ago. If you are going to talk about alleged inhumane treatment to this plaintiff, then let's talk about what happened while he was there and not something that happened years before that. It just wastes these poor jurors' time. They are just captives here, they are slaves. They are made to come here, and it wastes their time. And let's get through what is relevant in this matter and let them make a decision and get back to their normal, everyday affairs. And this just wastes their time.

Mr. Mitchell also points to a discrepancy in how Judge Seay admitted evidence regarding treatment of past prisoners when it benefitted appellees, but denied it when it benefited him. Finally, Mr. Mitchell states that towards the end of the trial Judge Seay began making "irrelevant personal attacks" upon his attorney. As an example Mr. Mitchell cites a colloquy that occurred when Mr. Mitchell's attorney requested an opportunity to visit with Mr. Mitchell regarding having his case heard out of order:

> THE COURT: And you might talk with somebody who has talked with them, like your law partner, who happens—I think the record is silent, but happens to be your wife as well, true?

> MR. COLCLAZIER: Judge I don't think that's relevant to anything in this case.

> THE COURT: No, except that you're not just with her eight hours a day, you're with her twenty-four hours a day, since she is your partner in life and your partner in your work. You can go ahead and talk with her.

Because we were only provided with limited pages of the record, it is difficult for us to know the context in which these remarks were made or Judge Seay's overall demeanor

throughout the trial. However, as has been held in the context of recusal cases, it is not solely the reality of actual bias or prejudice but also the appearance of impropriety that we must guard against. *See Liteky v. United States,* —— U.S. ——, ——, 114 S.Ct. 1147, 1154, 127 L.Ed.2d 474 (1994). In considering Judge Seay's actions and Mr. Mitchell's concerns, we are mindful of the Supreme Court's acknowledgment that "[a] fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). We are also mindful that "charges of misconduct or prejudice leveled at trial judges 'should not be lightly made and, once made, should not be casually treated by a reviewing court.'" *United States v. Gigax,* 605 F.2d 507, 510 (10th Cir.1979) (quoting *United States v. Cardall,* 550 F.2d 604, 606 (10th Cir.1976), *cert. denied,* 434 U.S. 841, 98 S.Ct. 137, 54 L.Ed.2d 105 (1977)).

In *United States v. Sears, Roebuck & Co.,* 785 F.2d 777, 780 (9th Cir.), *cert. denied,* 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986), the court advocated a three-part approach to be used in the absence of personal bias to determine whether circumstances warrant remanding to a new judge:

(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

■ There is no doubt Judge Seay has on several occasions expressed his view that Mr. Mitchell's Eighth Amendment claims are frivolous, a waste of the jury's time and as a matter of law fail to state a claim. There is also evidence that some of his statements and actions may cause a reasonable person to question whether justice was being done. Furthermore, because we are remanding for a new trial on Mr. Mitchell's claim, there would be little unnecessary duplication of effort in having a different judge preside over the new trial. Our job is to ensure Mr. Mitchell receives a fair hearing from an impartial judge. The history of the case, combined with evidence of Judge Seay's expressions of his disapproval toward Mr. Mitchell, his attorney and his claims indicate that in order to prevent any probability of unfairness or appearance of impropriety we should direct a new judge to hear the case on remand. We stress this decision is not based on a finding Judge Seay harbored any personal bias or acted improperly, but merely on the conclusion that the interests of justice would be best served by remanding this case with instructions that a different judge be assigned.

## VIII

For the reasons stated above, we **REVERSE** the district court with respect to Appellant's condition of confinement Eighth Amendment claim and **REMAND** for a new trial, **AFFIRM** in all other respects and direct that on remand a different trial judge be assigned to preside over the proceedings.